Darin **WILLIAMS, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 54A01–0012–PC–453.

Court of Appeals of Indiana.

Nov. 9, 2001.

Dennis E. Zahn, James H. Voyles, Voyles, Zahn, Paul, Hogan & Merriman, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Timothy W. Beam, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

In this consolidated direct appeal and appeal from postconviction proceedings, Darin Williams (Darin) challenges the court's denial of his requests for relief after his convictions for attempted murder and robbery.[1]

We affirm in part, reverse in part and remand.

### ISSUES

1. Whether jury misconduct denied Darin a fair trial.

2. Whether prosecutorial misconduct denied Darin a fair trial.

3. Whether Darin was denied his right to effective cross-examination of witness Joe Couch.

4. Whether Darin is entitled to a new trial based upon newly discovered evidence.

5. Whether Darin's convictions for attempted murder and robbery constitute double jeopardy.

### FACTS

The facts and evidence adduced at trial and most favorable to the verdict reveal the following: Darin and his wife Teresa met and began dating in 1987, and married in 1990. In 1995, Teresa was injured when lumber fell from a passing truck while she was driving. Teresa lost her right eye. Although her left eye was injured, she retained $20/70$ near vision and $20/200$ distance vision.

---

1. Oral argument was held on September 7, 2001 at Carmel High School. We thank Mr. Lee Lonzo for organizing the event and the staff, faculty, and students of Carmel High School for their hospitality.

Soon after the accident, Teresa and Darin began experiencing marital difficulties. In October 1996, Darin told Teresa that he wanted a divorce. Teresa moved in with her parents and filed for divorce.

In February 1997, Teresa moved to Crawfordsville, and Darin remained in contact with her. He visited her and spoke of reconciling; however, in the fall of 1997, Teresa began dating Danny Shaw. Darin started dating Shawna Harshbarger. Darin and Shawna Harshbarger planned to marry in December 1998.

Teresa attempted to settle the division of assets in the dissolution of her marriage to Darin. The parties had acquired several assets including: a bar in Jamestown known as the B & B Tavern with an adjoining restaurant and pizza kitchen, a video store, and a farm where Darin's grandparents lived. Also, Darin operated a construction business. Because Teresa's injuries had left her with significant health concerns and decreased employment opportunities, she wanted to divide the property such that she would receive the farm in order to rent the tillable land to generate income. In exchange, Teresa offered Darin the other property, including all of the vehicles. Teresa was willing to allow Darin's grandparents to continue to reside on the farm. Darin was not satisfied with Teresa's offer and the matter was scheduled for a final hearing.

John Kepler operated the B & B Tavern for Darin and, also, assisted him in his construction business. Joe Couch and Michael Whittaker were bar patrons, and both knew Kepler and Darin.

In the fall of 1998, Kepler told Couch that Darin wanted to speak to him. Couch saw Darin about one week later at the B & B Tavern. Darin told Couch that he had a problem and needed to have his wife shot so that he would not be financially ruined in the divorce. Couch refused. Couch showed Darin three handguns and a rifle and "suggested that he do his own laundry." (R. 1141). Later, Couch told Kepler that Darin had asked him to kill someone. Although Couch was not certain that Darin was serious about the threat, Couch began telling people at the B & B Tavern about the conversation in an effort to deter Darin.

In September 1998, Kepler had also approached Whittaker and told him that Darin wanted to speak to him. Later, Darin telephoned Whittaker and told him he needed to speak with him in person. Darin went to Whittaker's home and told Whittaker that he stood to lose a lot in the divorce; specifically, he referred to a family farm in North Salem. He asked Whittaker if he would kill Teresa or if he knew anyone who would. Whittaker refused; however, Darin assured Whittaker that he had money to pay for the killing. Whittaker again refused.

On November 6, 1998, Darin went to Teresa's home in Crawfordsville. Teresa was watching a morning television news program, when she heard persistent knocking at the side door. She glanced at the clock and noticed that it was about 8:33 a.m. She pulled the curtain back from the window in the door and saw Darin. Darin told Teresa that he was in the area and stopped by to see her. Darin opened the screen door and Teresa admitted him into the house. Teresa testified that Darin seemed "nervous ... perturbed, something seemed to be bothering him he was a little red in the face." (R. 1348).

Teresa offered Darin some coffee. He declined and said that he could not stay long. She then offered to show him her new computer and Braille program.[2] As

---

2. The evidence demonstrates that Teresa retained significant vision in her left eye and

could still read the paper and perform func-

Teresa leaned over to replace the Braille book after showing Darin, he asked her to show him the book again. As she attempted to comply, Darin approached Teresa from behind, placed his left arm around her neck, and pulled her back. Teresa thought Darin was pulling her back to kiss her. Darin shot Teresa in the back of the head. Teresa felt extreme pain; her ears were ringing, she could not see, and subsequently, she lost consciousness.

Carmen Bullock and Jeri Storm had an appointment to meet Darin at the B & B Tavern in Jamestown at 9:30 a.m. on November 6, 1998. Darin had built a home for Storm's mother, and Bullock and Storm made an appointment with Darin to discuss the possibility of Darin building a home for them.

At 8:00 a.m. that morning, Storm had seen Darin's distinctive truck traveling southbound past her home in Mace, Indiana. At approximately 8:30 a.m., Storm's sister had seen Darin's truck traveling northbound past her home. Storm's sister lives next door to Storm and near the job site where Darin, Kepler, Michael Williams (Darin's father), and Paul Brasher had been working. On the morning of November 6, Brasher had telephoned Darin on his cellular telephone at 7:20 a.m., at 8:17 a.m. or 8:27 a.m., and at 8:51 a.m. Brasher testified that he was surprised that Kepler answered the call made to Darin's cellular telephone at 8:51 a.m. Then, at approximately 9:00 a.m. or 9:05 a.m., Stephen Killen observed Darin walking out of Darin's house located near the bank in New Ross.

When Bullock and Storm arrived at the B & B Tavern at approximately 9:25 a.m., the door was locked and no one was there. Approximately five to fifteen minutes later, Michael Williams let Bullock and Storm in

the bar. While they were waiting inside, Michael Williams took a telephone call from Darin who said that he was "at the edge of town" and would arrive shortly. (R. 1103).

When Darin arrived, he appeared as though he had just showered. Darin had offered to show Bullock and Storm a house he built. They had arranged to see the house that day because Darin had told them that he needed to replace the microwave. When they left the B & B Tavern, Bullock and Storm followed Darin's truck to the house. Kepler was in the truck with Darin, and Darin drove very fast. Darin showed Bullock and Storm the house, and then they "went out in the garage and Darin ... said you know, if this is what you want to do just let us know or let me know and that was it." (R. 1080). Darin quickly left while Bullock and Storm were still at the house. Bullock and Storm noticed that Darin did not seem to have a microwave with him and left without replacing the microwave in the house.

In the afternoon, Teresa awoke and called Crawfordsville's emergency dispatch at 2:41 p.m. She told the dispatcher, "my soon to be ex-husband came over and hit me in the back of my head and I collapsed." (R. 905). When the paramedic arrived, Teresa opened the door. She told the paramedic that Darin Williams had hit her in the head in her computer room at about 8:30 a.m. She said that she did not telephone for help earlier because she had to sleep or she had collapsed. She said that her head felt as though it was going to explode.

As he was treating Teresa in the bedroom, the paramedic noticed that the drawers in a chest and nightstand were open, which seemed out of place considering that the living room appeared "to be

---

tions such as filing in an office. However, her physician had suggested that she learn Braille

because he thought she would find it interesting.

fairly immaculate." (R. 922). The paramedic did not go in the other rooms in the house.

Teresa's sister-in-law, Stacy Krutzsch, saw police and fire vehicles at Teresa's house. Krutzsch entered the house and spoke to Teresa and the police. Teresa seemed calm and was able to speak. Krutzsch attempted to locate Teresa's wallet with identification and insurance information. She found Teresa's purse but the wallet was missing. Also, Krutzsch noticed that the house seemed to be in disarray, which was unusual because Teresa kept a clean and tidy home. Krutzsch observed that "the desk [in the computer room] was open with papers everywhere and the file cabinets seemed to be moved slightly." (R. 944).

While Teresa was being stabilized at her home, she told Crawfordsville Police Officer Russell Brown that she had been watching a morning news program in bed when she heard a persistent knock at her door. She told Brown that after she admitted Darin, he struck her.

Teresa was stabilized and taken to the Culver Hospital Emergency Department. When she arrived, she was alert and could follow commands. She complained of pain in the back of her head, her neck, and her shoulder. She repeated to Dr. Pamela Peek, an emergency department physician, that her husband had hit her, and that she had lost consciousness. She further told Dr. Peek about her previous injury and explained that she had poorer vision in her left eye than she had prior to being struck that morning.

A CAT scan revealed a skull fracture and metallic fragments that had penetrated brain tissue. Also, Teresa had "bubbles of air in the neck muscle in the back of her neck" which is consistent with a gunshot wound. (R. 1008). After speaking to Teresa's physician about her first injury, Dr. Peek determined that the metallic frag-

ments were attributable to the new injury. Dr. Peek concluded that Teresa had suffered a blunt force or penetrating injury with great force and determined that she should be transferred to a "level one trauma center" in Indianapolis. (R. 1007). Dr. Peek stated that the injury sustained by Teresa "could easily have killed her, disabled her or left her in a persistent vegetative state." (R. 1008–09).

Teresa was transferred to Methodist Hospital in Indianapolis. She was awake and alert when she was examined by a neurosurgeon, Dr. Kenneth Renken. She complained of blurred vision in her left eye, headache, and neck pain. Dr. Renken observed a laceration on the right side at the base of her skull. Further examination revealed that she had sustained "a gunshot wound to the head in the posterior fossa which describes that part of the brain at the back of the skull." (R. 976). During the examination, Teresa told Dr. Renken that her husband had caused the injury. She was in the hospital for seven days.

Later, Teresa discovered that three watches and some earrings were missing from her jewelry box, and that her wallet was missing from her purse.

On December 23, 1998, Darin was charged with Count I attempted murder, as a class A felony; Count II battery with a deadly weapon, as a class C felony; Count III aggravated Battery, as a class B felony; and Count IV robbery, as a class A felony. Darin's bond was set at $250,000, which was posted.

On New Year's Eve, Joe Couch went to the B & B Tavern. Shawna Harshbarger told Couch that he was not welcome at the bar. Then, "Darin himself came down and escorted [Couch] outside the front door and told [him] . . . you've been in here running your mouth . . . and I can't have that." (R. 1144). On January 2, 1999, Couch contacted the brother of a Boone County Deputy Sheriff regarding the conversation

he had with Darin in the fall regarding the threat to Teresa.

At Darin's jury trial, held from June 29, 1999 through July 8, 1999, the State introduced evidence that Captain Kurt Knecht, with the Crawfordsville Police Department, calculated the driving distances and times between several points. Captain Knecht calculated the times driving at the speed limit while obeying all traffic signs and lights, and then driving at greater speeds on county roads while obeying all traffic signs and lights. From the point where Storm and Storm's sister placed Darin's truck on the morning of Teresa's shooting and Darin's home was 6.3 miles. (R. 1609). Driving at the speed limit, Captain Knecht testified that he made the trip in 7 minutes. Driving at an excessive rate of speed, Captain Knecht said he made the trip in 4 minutes. Captain Knecht calculated the distance from the job site to Teresa's home as 7.2 miles. Traveling at the speed limits, the trip took him 10 minutes. At speeds in excess of the limits, the trip took 8 minutes. The distance between Teresa's house and Darin's house was 12 miles. The trip took him 16 minutes at the speed limits and 12 minutes at the greater speeds. Captain Knecht calculated driving times for other points as well. Darin also introduced evidence by his own expert as to the driving times to and from various points.

The State introduced into evidence the cellular telephone records for Darin and the B & B Tavern. The telephone records, consisting of 81 pages, were entered into evidence without any testimony or explanation as to their contents, and without objection. During its closing argument, the State made reference to portions of the cellular telephone records with regard to pinpointing Darin's location during telephone calls.

The jury returned guilty verdicts on all counts.

On July 14, 1999, Darin's father, Michael Williams, died. The Hendricks County Coroner ruled "the cause of death was acute carbon monoxide poisoning and that the manner of death was suicide." (R. 2017). A note was found with his body. In the note, Michael Williams did not claim responsibility for Teresa's gunshot injuries, but did allude to the circumstances by stating that he hoped Teresa, her father, Jamestown, and the Hendricks County Judicial System "Rot in Hell." (R. 2018).

On July 21, 1999, Darin filed a motion to correct error alleging jury misconduct and newly discovered evidence. The motion was accompanied by affidavits from three jurors and an affidavit from an attorney, Darren Cole, who had consulted with Michael Williams prior to Darin's trial. The jurors attested to matters discussed during the trial and deliberations. In the affidavit submitted by Cole, he noted that after Michael Williams' death, the attorney-client privilege had been waived by his personal representative. Cole attested, *inter alia*, that Michael Williams had told him that he shot Teresa, that his son did not know of his actions, and that he was confident that his son would be acquitted.

The State opposed the motion to correct error. Darin then offered an affidavit by a licensed bail bondsman, Rick Posha, who also had spoken to Michael Williams about Darin's situation. Michael Williams had told Posha that "he was responsible for what happened to Darin's wife." (R. 653). The State filed a supplemental affidavit by Posha. In the supplemental affidavit, Posha explained that he believed that Michael Williams "meant that he was somehow responsible for the break-up of the marriage of Teresa Williams . . . . [and][t]hat at no time did Jerry Michael Williams state to this affiant that Jerry Michael Williams shot Teresa Williams." (R. 658–59).

On September 10, 1999, the trial court denied Darin's motion to correct error. The court addressed both jury misconduct and newly discovered evidence, and found:

In his first point, defendant specifically argues that the jury engaged in the following misconduct: (1) discussed, commented and considered that defendant did not testify, (2) formed and expressed the opinion that the defendant was guilty even before the defense began presenting evidence, (3) relied upon extrinsic materials not admitted into evidence, specifically defendant claims that a juror drove routes which were at issue in the trial and reported the distances and times to other jurors, (4) continued to discuss the case even after a special admonishment by the court, and (5) an alternate juror participated in the deliberations by stating "hurry up" to reach a verdict because she needed to go home.

In his second point, defendant argues that he has a right to a new trial because there is newly discovered evidence. Specifically, defendant claims that he has the right to present for the jury's consideration two statements attributed to his deceased father. Defendant claims those statements reveal that his father is responsible for the victim's shooting and that they are admissible under the Rules of Evidence.

(R. 660–61). Reasoning that jurors cannot impeach their verdict unless they were exposed to "improper, extrinsic material during" deliberations, (R. 661), the trial court determined that, with two exceptions, none of the alleged jury misconduct amounted to "extraneous prejudicial information" or "outside influences for purposes of the exception provided for inquiry into [the] validity of [the] jury's verdict." (R. 664–65). The trial court determined that a juror reporting to the other jurors that he had driven the routes and that Darin "could have done it," (R. 665), constituted extraneous information. However,

the juror's actions and report that Darin had time to commit the crime did not prejudice Darin because it was cumulative of evidence presented at trial and because other substantial and independent evidence of his guilt existed. The trial court also determined that an alternate juror's statement imploring the jurors to "hurry" because she had a commitment constituted extraneous information. The trial court concluded that the statement would not have influenced "the average juror" and was harmless. (R. 669).

The trial court analyzed the two statements attributed to Michael Williams in light of the law regarding newly discovered evidence and the trial rules concerning the admissibility of out-of-court declarations under Ind. Evidence Rule 804. The trial court determined that the statements allegedly made by Michael Williams lacked indicia of trustworthiness or reliability for the following reasons: 1) the statements were not made in close proximity to commission of the crime, 2) Michael Williams did not exonerate his son in the suicide note, 3) Michael Williams had testified at trial and in his deposition that he did not go to Teresa's house on the day of the shooting, and 4) "[a] disturbed and depressed father contemplating suicide might well have made these statements without believing them to be true. After the trial, the father knew his son was going to prison and likely felt some responsibility for his son's situation and wished to help him out...." (R. 675). The trial court determined that the statements were not admissible and that "even if admitted at trial probably would 'not produce a different result." (R. 677).

On September 21, 1999, the trial court entered a sentencing order stating, in pertinent part:

The court finds that the defendant should be sentenced to the Indiana Department of Corrections for a period of

fifty (50) years on Count I [attempted murder] with no fine but court costs assessed in the amount of $125.00. The court further finds that the defendant should be sentenced to the Indiana Department of Corrections for a period of thirty (30) years on Count IV [robbery] with no fine but court costs assessed in the amount of $125.00. The court further finds that the convictions on Count[s] II [battery with a deadly weapon] and III [aggravated battery] should be merged into the conviction for the attempted murder charge and the court will not sentence the defendant on Counts II and III.

(R. 680). The court ordered the sentences to be served consecutively.

Darin commenced a direct appeal of his conviction in October 1999. In order to present additional evidence not in the record, on February 23, 2000, Darin filed a petition with this court requesting suspension of his direct appeal and remand to the trial court for a hearing on newly discovered evidence with the right to reinstitute the appeal upon conclusion of the trial court proceedings. On February 28, 2000, this court granted Darin's petition.

On March 29, 2000, Darin filed his petition for postconviction relief. The postconviction petition alleged 1) prosecutorial misconduct with regard to arguments made in the State's closing statement as to the telephone records submitted at the close of the State's case-in-chief; 2) improper or extrinsic influence on the jury; and 3) newly discovered evidence with regard to additional affidavits indicating "that someone other than the Defendant committed the crimes charged...." (Postconviction R. at 9). After a hearing on postconviction relief, the trial court denied Darin's request for relief.

## DECISION

■ Here, Darin employed the *Davis/Hatton* procedure to suspend his direct appeal in order to present additional evidence to be included in the record of proceedings. The procedure "involves a termination or suspension of a direct appeal already initiated, upon appellate counsel's motion for remand or stay, to allow a postconviction relief petition to be pursued in the trial court." *State v. Lopez*, 676 N.E.2d 1063, 1069 (Ind.Ct.App.1997)(citing *Davis v. State*, 267 Ind. 152, 368 N.E.2d 1149 (1977); and *Hatton v. State*, 626 N.E.2d 442 (Ind.1993)). The *Lopez* court explained:

> If after a full evidentiary hearing, the [postconviction] relief petition is denied, the appeal can be reinitiated. Thus, in addition to the issues initially raised in the appeal, the issues litigated in the postconviction relief proceeding (e.g., ineffectiveness of trial counsel) can also be raised. In this way, even if the trial court denies the postconviction claim ..., a full hearing and record on the issue will be included in the appeal.

*Id.* Once the petition for postconviction relief is denied after a hearing, and the direct appeal is reinstated, the direct appeal and the appeal of the denial of postconviction relief are consolidated. *See Powell v. State*, 714 N.E.2d 624, 626 (Ind.1999).

Thus, we have before us issues of direct appeal and issues of appeal from the denial of a petition for postconviction relief. The standards of review therefore differ and will be treated accordingly.

### 1. *Jury Misconduct*

 Darin raised issues regarding jury misconduct within his direct appeal.[3]

---

**3.** Darin also raised an issue of jury misconduct within his postconviction proceedings. At the postconviction hearing, Darin explicitly

A defendant who seeks a new trial based upon jury misconduct must demonstrate that "the misconduct (1) was gross and (2) probably harmed the defendant." *Griffin v. State*, 754 N.E.2d 899, 901 (Ind.2001). A trial court's determination as to the existence of jury misconduct is reviewed for an abuse of discretion.

In his direct appeal, Darin contended that:

(a) The jury relied upon and improperly used extrinsic material and influences not admitted into evidence, not under oath or subject to cross examination. At least one juror, Emmert, drove routes which were at issue in the trial and reported the distances and times to other jurors concluding "he could have done it." [R. 599, 600, affidavits of Day and Stark].

(b) The jury continued to discuss the case among themselves, even after a specific admonishment by the Court to refrain from doing so, including showing notepads to one another. [R. 599, 600, 601, affidavits of Day, Stark, and Callom].

(c) The jury discussed, commented upon and considered the fact that the defendant did not testify. [R. 599, 600, 601, affidavits of Day, Stark, and Callom].

(d) Formed and expressed the opinion that the defendant was guilty even before the defense began presenting evidence. [R. 599, 600, affidavits of Day and Stark].

Appellant's Brief at 9.

Indiana Evidence Rule 606 provides, in pertinent part:

(b) Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify (1) to drug or alcohol use by any juror, (2) on the question of whether extraneous prejudicial information was improperly brought to the jury's attention or (3) whether any outside influence was improperly brought to bear upon any juror. A juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying may not be received for these purposes.

A verdict may not be impeached by evidence from the jurors who returned it. *See Johnson v. State*, 700 N.E.2d 480, 481 (Ind.Ct.App.1998). However, as noted in Evidence Rule 606(b), an exception exists when jurors are exposed to improper extrinsic matters during deliberations and there exists a substantial possibility that the extrinsic material prejudiced the verdict. *See Stephenson v. State*, 742 N.E.2d 463, 477 (Ind.2001). The defendant must demonstrate that the matters are extrinsic. *Id.* Once the defendant carries that burden, the burden shifts to the State to demonstrate that the matter is harmless. *Id.*

After the adoption of Evidence Rule 606(b), courts may "accept juror affidavits stating that deliberations were tainted by improper information or influence, but disregard any statements on the effect of that information or influence on the juror's decision." *Griffin*, 754 N.E.2d at 902. In *Griffin*, our supreme court observed:

The problem, of course, is how to protect such vital defendants' rights as

waived consideration of his postconviction allegation of jury misconduct.

the right to confront witnesses (which may be violated if a jury considers information that was not in evidence) or the right to an impartial jury, if the best (and often only) witnesses to jury improprieties cannot be heard. The U.S. Supreme Court considered that dilemma over a century ago and held that a juror "may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind." *Mattox v. United States*, 146 U.S. 140, 149, 13 S.Ct. 50, 36 L.Ed. 917 (1892) (quoting *Woodward v. Leavitt*, 107 Mass. 453 [1871 WL 8700] (1871)). This Court adopted the *Mattox* approach in *Fox v. State*, 457 N.E.2d 1088, 1093 (Ind. 1984).

*Griffin*, 754 N.E.2d at 902 (reaffirming Indiana's adherence to the rule in *Mattox*).

■■ "[A]n experiment by the jury is improper where it amounts to additional evidence supplementary to that introduced during the trial." *Bradford v. State*, 675 N.E.2d 296, 304 (Ind.1996) (quoting *Kennedy v. State*, 578 N.E.2d 633, 641 (Ind. 1991), *cert. denied* 503 U.S. 921, 112 S.Ct. 1299, 117 L.Ed.2d 521 (1992)). Darin contends that Juror Emmert's report that he drove the routes and that Darin could have committed the crimes constituted additional extrinsic evidence which was prejudicial for several reasons: 1) the juror's report constituted independent, extraneous matter inasmuch as evidence was presented by the State and Darin as to the driving times and distances; 2) the report by the juror was not subject to cross-examination; and 3) the report by the juror had a probable persuasive effect on the jury.

The State contends that the affidavits do not establish that the juror conducted his own experiment; rather, one affidavit [4] suggests that through his own life experiences, the juror is aware that driving the routes is possible within the time frames necessary for Darin to have committed the crimes. *Cf. Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir.1994)(juror's opinion was part of the "fund of ordinary experience that jurors may bring to the jury room and may rely upon."). Further, the State urges that if the affidavit establishes that the jury was exposed to extrinsic matter, it is merely cumulative of other properly admitted evidence at trial. Darin's expert did not refute the State's evidence that Darin could have been in the places he was seen and at Teresa's home within the time frames in evidence. According to the State, "[i]n essence, there was no real dispute that Defendant could have shot Teresa and then been at the locations where he was seen later in the morning." Appellee's Brief at 11. Thus, there does not exist a probable persuasive effect on the jury. Finally, the State reminds us that the eyewitness testimony by Teresa confirmed that Darin was the shooter. We agree with the State's analysis.

■■ The affidavits submitted by Darin do not establish conclusively that a juror conducted his own experiment driving the routes and then reported the extrinsic evidence to the jury. Thus, Darin has not established that the jury was subjected to extrinsic material. *See Stephenson v. State*, 742 N.E.2d at 477.

■■ Moreover, even if Darin had presented evidence to shift the burden to the State, he has failed to demonstrate that

---

4. Two juror affidavits refer to the juror's contention that Darin could have committed the crimes within the time frames presented because he had driven the routes. One affidavit suggests that the juror may have personal experience driving the routes. The other affidavit states that the juror reported that based upon his "investigation" Darin "could have committed the crime[s]." (R. 600).

the potential misconduct was gross or constituted probable harm to him. *See Griffin*, 754 N.E.2d at 901–902. The evidence in the record, including Darin's expert's testimony, demonstrates that Darin had sufficient time to be in the places he was seen on the morning of the crimes and to commit the crimes at Teresa's home. Further, Teresa, who had known Darin since 1987 and had been married to him since 1990, identified Darin as the person who inflicted her injuries on November 6, 1998. The evidence renders any possible error harmless.

■■■■ As to the other incidents of jury misconduct alleged by Darin, he contends that "the cumulative misconduct of the jury in this case beginning during the trial and continuing into deliberations was fundamentally prejudicial and violated the defendant's right to due process...." Appellant's Brief at 16. The State urges that Evidence Rule 606 prohibits members of the jury from submitting affidavits regarding matters that occurred during the course of deliberations that concerned the jurors' mental processes in connection with the verdict.

> [If] verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication[, then] all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation-to the destruction of all frankness and freedom of discussion and conference.

*Koo v. State*, 640 N.E.2d 95, 105 (Ind.Ct. App.1994) (quoting *Knight v. Parke*, 595 N.E.2d 280, 281 (Ind.Ct.App.1992)). The balance of Darin's contentions of jury misconduct raised within his direct appeal are aimed at alleged deficiencies in the deliberative process, and are not subject to attack by the juror's affidavits. "Intrajury influence is not sufficient to overturn a verdict." *Griffin*, 754 N.E.2d at 903 (including determination that communication by alternate juror not reversible error).

Darin has failed to present reversible error with regard to his allegations of jury misconduct.

### 2. *Prosecutorial Misconduct*

■■■■ Darin raised prosecutorial misconduct as a ground for error in his petition for postconviction relief. Darin bore the burden in the postconviction court of establishing the grounds for relief by a preponderance of the evidence. *See Dowdell v. State*, 720 N.E.2d 1146, 1150 (Ind. 1999). Darin appeals from a negative judgment; thus, in order to gain reversal, he must demonstrate that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the postconviction court. *Id.* We will disturb the postconviction court's ruling only if the evidence is without conflict and leads solely to a conclusion contrary to the result reached by the postconviction court. *Id.*

■■■ Darin contends that the State misrepresented the evidence contained within, and the significance of, the cellular telephone records because cellular telephone representatives told police officers "that a call coming through the Crawfordsville tower did not mean that the caller had to be in Crawfordsville." Appellant's Brief at 22. Darin contends that the failure to give that information to him amounted to withholding exculpatory evidence and the State's arguments that the cellular records

document his location at certain times amounted to prosecutorial misconduct.[5]

The telephone records were introduced without objection by Darin. After the exhibit was passed to the jury, the State immediately rested its case-in-chief.[6] The State did not offer an explanation of the 81 page exhibit. In an effort to demonstrate that Darin had sufficient time to commit the crimes, during closing argument the State detailed specific times when calls were made to or from Darin's cellular telephone, whether the calls were answered, and the location of Darin's truck during certain calls based upon the cellular tower that transmitted the call as found in the cellular telephone records.

The director of network engineering for the cellular telephone company, Darren Isaac, testified at the hearing on postconviction relief. The following colloquy occurred:

Q. Based upon the kinds of records that Cellular One generates in the normal course of its business, some which you have there in front of you. Is it possible to tell what tower a call comes off of?

A. (Pause)

Q. When I say come off of, I don't know that that's a word of art it's just simply my way of.

A. Yes, yes it is. Based on these records you can indicate here, it's indicated here what the originating cell site or cell tower is.

Q. Because those records reflect an originating cell tower, does that necessarily mean that a person is at that exact location?

A. No it does not.

Q. If for instance a call were to come, originate at the Jamestown tower, does that necessarily mean that the person using that cell phone was in Jamestown?

A. No.

Q. If I were to represent to you that Mace, Indiana is approximately midway between Jamestown and Crawfordsville, if a person were in Mace, Indiana could a call come off either of those towers?

A. Yes.

\* \* \* \* \*

Q. ... . Mr. Isaac why can't one pinpoint a cell phone location by the tower?

A. A tower is located in a, at a physical address but the tower itself has antennae[ ] which have the capability to cover a radius of area and each tower varies. It could be anywhere from uh one mile radius to a fifteen or twenty mile radius. Uh the particular towers that are in this area, the majority of them are [omnidirectional] towers where there's basically one antenna[ ] that covers around, an area around the tower. Uh so a person could actually be outside of a particular um town and actually originate a call but not necessarily be in, the tower itself can be in that town but the individual, because of the coverage of the antennae could actually be outside of that area. And that coverage varies on atmospheric condition[s], it varies on terrain, uh as you go up and down hills and in valley[s], you may be closer to an individual cell site but there may be a site that's farther away that has a better line of sight or a better focus to that particular mobile so it just really varies. It's

---

**5.** Darin also claims that the conduct by the State entailed violations of the Indiana Professional Conduct Rules.

**6.** Darin contends that the State led him to believe that a sponsoring witness for the exhibit would be called by the State. Also, he

contends that he did not object to the exhibit because he had no reason to believe that the State would misrepresent the information contained within the records. The State responds that the potential witness was disclosed by the State and that Darin could have called the witness.

really a probability question more than anything else.

* * * * *

Q. Mr. Isaac if a call were to come off the Jamestown tower and then a slight period of time later a person utilizing that same phone make[s] a call and that call originate[s] off the Crawfordsville tower, does that necessarily show any movement by the person placing the call?

A. No not necessarily.

(Postconviction R. 144–45, 151–52).

Penny Stephens, a cellular telephone representative, testified that when police officers requested Darin's cellular telephone records, she explained that the location of the tower does not coordinate with the location of the person making the call.

Darin contends that the State violated the disclosure requirements of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to notify him of the exculpatory nature of the evidence regarding interpretation of the cellular telephone records.

In response, the State argues that Darin was given his cellular telephone records and that a cellular telephone representative, John Osborne, was listed as a potential witness. Thus, according to the State, the information was not withheld, and Darin's claim amounts to a contention that the State should have prepared his defense.

■■■■■■ "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. "To prevail on a *Brady* claim, a defendant must establish: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial." *Minnick v. State,* 698 N.E.2d 745, 755 (Ind.1998), *cert. denied* 528 U.S. 1006, 120 S.Ct. 501, 145 L.Ed.2d 387 (1999). "Evidence is 'material' only if there is a 'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.,* (quoting *United States v. Bagley,* 473 U.S. 667, 685, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). However, "the State will not be found to have suppressed material information if that information was available to a defendant through the exercise of reasonable diligence." *Conner v. State,* 711 N.E.2d 1238, 1246 (Ind.1999), cert. denied 531 U.S. 829, 121 S.Ct. 81, 148 L.Ed.2d 43 (2000).

Here, the State disclosed the existence of the cellular telephone records (a fact that would have been known to Darin), and disclosed a witness familiar with the records. We cannot say that exculpatory evidence was withheld from Darin.[7] See *Minnick,* 698 N.E.2d at 755.

■■■■ Darin also contends that the State committed prosecutorial misconduct by misrepresenting the evidence contained within the records.[8] The State contends that any claim of prosecutorial misconduct

---

7. As we note in the second part of the issue, it is not entirely clear that the evidence would have been considered exculpatory. The evidence submitted at the postconviction proceedings does not preclude Darin's presence at the places indicated; it merely fails to establish his presence.

8. In *Minnick,* our supreme court noted:

The failure to disclose exculpatory evidence and use of false evidence cases are inextricably intertwined, and one noted treatise has observed that "the Supreme Court has treated them as based on similar principles and governed by analogous standards." 2 WAYNE R. LaFAVE AND JEROLD H. ISRAEL, CRIMINAL PROCEDURE § 19.5, at 531 (1984). The United States Supreme Court frequently

is waived because Darin failed to object. Thus, according to the State any review of the issue would fall into the category of fundamental error.

In *Charlton v. State,* 702 N.E.2d 1045, 1051 (Ind.1998), the court stated:

> Fundamental error is a substantial blatant violation of basic principles rendering the trial unfair to the defendant and, thereby, depriving the defendant of fundamental due process. The error must be so prejudicial to the rights of a defendant as to make a fair trial impossible. "For prosecutorial misconduct to be fundamental error, it must be demonstrated that the prosecutor's conduct 'subjected the defendant to grave peril and had a probable persuasive effect on the jury's decision.'" *Carter v. State,* 686 N.E.2d 1254, 1262 (Ind.1997) (quoting [*Isaacs v. State,* 673 N.E.2d 757, 763 (Ind.1996)]). The gravity of peril turns on the probable persuasive effect of the misconduct on the jury's decision, not on the degree of impropriety of the conduct.

(some citations omitted). The State contends that the arguments by the deputy prosecutors did not subject Darin to grave peril and did not have a probable persuasive effect on the jury's decision in light of the eyewitness evidence placing Darin at the scene of the shooting and robbery. The State characterizes the deputy prosecutors' statements about the location of the cellular telephone based upon the tower that intercepted the calls as arguments of "the State's view of the evidence." Appellee's Brief at 18.

The State is correct that the proper interpretation of the cellular records was available to Darin; however, the State could not knowingly misrepresent the significance of the data. While the deputy prosecutors' arguments regarding the significance of the data appear to have been misinterpretations, we also note that the errors were especially untoward considering the State had at its disposal information, gained by the investigating police officers, that the cellular telephone records with locations of towers from which calls are transmitted do not exactly correlate with the locations of the cellular telephones sending or receiving the calls.

 It is the State's role to present, to the best of its ability, the truth. Inaccuracies obfuscate the evidence thereby placing a strain on the jury's function, failing to promote the public's interest with which the State is charged, and possibly, trammeling the rights of the accused. The interpretation of technical data should not be undertaken without full confidence in the interpretation. We think that the State fell short of its obligation to investigate and properly present information with regard to the cellular telephone records. However, without condoning the State's misinterpretations of the data during closing arguments,[9] we cannot say that the

---

cites the two lines of cases together. We will therefore treat these claims together. *Minnick,* 698 N.E.2d at 755. In the present case, the issues revolve around the same records but are not inextricably intertwined. Thus, we examine them separately.

9. We are unconvinced by the suggestion that error does not exist because the deputy prosecutors' misinterpretations of the data occurred during final arguments, which are not considered evidence. *See Robinson v. State,* 724 N.E.2d 628, 639–40 (Ind.Ct.App.2000) (possible prejudice by suggestion that defen-

dant should have presented evidence was ameliorated by instructions that arguments of counsel do not constitute evidence). This is not a case in which the State misinterpreted or mistakenly altered evidence presented to the jury during trial. The jury was not presented with any evidence interpreting the data. Thus, the jury could not discern for itself the distinction between evidence presented at trial and the arguments of counsel. While it is true that arguments of counsel do not constitute evidence, it does not follow that during argument counsel are absolved of the duty to truthfully present evidence and argument.

errors in interpreting the data had an impact on the final determination by the jury.

■ Absent the State's misinterpretation of the data, the jury would have been left with 81 pages of raw data that it may or may not have misinterpreted. In the end, however, the most favorable interpretation Darin could have obtained from the data is that the cellular records did not conclusively pinpoint the location of his cellular telephone during the transmittal and receipt of calls on the morning the crimes were committed.[10] The State, through numerous witnesses, presented significant evidence to the jury that Darin had sufficient time to commit the crimes at Teresa's home in Crawfordsville and to be present at the various places he was seen on the morning of the crimes.

Darin failed to present evidence that the proper interpretation of the data was material, in that a reasonable probability existed that, had the evidence been properly characterized, the result of the proceeding would have been different. *See Minnick*, 698 N.E.2d at 755.

### 3. *Cross-examination of Couch*

■ In his direct appeal, Darin contends that he was denied his right to effective cross-examination of Joe Couch. Although the right to cross-examine witnesses is one of the fundamental rights within our criminal justice system, it is subject to reasonable limitations at the discretion of the trial court. *McCarthy v. State*, 749 N.E.2d 528, 533 (Ind.2001) (rejecting per se error when cross-examination of a witness for bias is not allowed); *Smith v. State*, 721 N.E.2d 213, 218–19 (Ind.1999). Violations of the right to cross-examine witnesses are subject to the harmless-error analysis. *McCarthy*, 749 N.E.2d at 534–35; *Smith*, 721 N.E.2d at 219. "To determine whether an error is harmless, courts look to several factors, including the strength of the prosecution's case, the importance of the witness' testimony, whether the testimony was corroborated, the cross-examination that did occur, and whether the witness' testimony was repetitive." *Smith*, 721 N.E.2d at 219.

■ Darin contends that he was denied his right to effective cross-examination of Joe Couch regarding possible bias or favors offered in exchange for his testimony. Prior to trial, the State filed a motion in limine to prevent Darin "from inquiring into or eliciting testimony or presenting evidence . . . [c]oncerning pending charges against the State's witness, Joseph Couch, in Boone County, Indiana alleging offenses of possession of marijuana and carrying a handgun without a permit, as said criminal charges are a result of acts unrelated to the instant case involving Darin Williams and said charges were filed as a result of an incident alleged to involve Mr. Couch after November 6, 1998." (R. 145). At trial, Darin made an offer to prove that Couch agreed to testify for the State in exchange for a benefit, *i.e.*, the return of his handguns, after Couch was arrested on criminal charges in Boone County. Darin asked to explore the question whether Couch expected to receive preferential treatment on his pending charges. Darin contends that the evidence would have been directed to Couch's bias.

In the offer to prove, Couch acknowledged that he gave his formal statement about the conversation with Darin after he was arrested for possession of marijuana and handguns. However, Couch explained

---

**10.** It is noteworthy that the jury was presented with evidence that on the morning the crimes were committed at Teresa's home, on at least one occasion, Kepler answered Darin's cellular telephone. Thus, it appears that Darin's cellular telephone did not remain in his possession during the entire morning.

that he initially told his story to an intermediary, the brother of a Boone County Deputy Sheriff, two weeks before his January 14, 1999 arrest. Couch noted that although he did not speak directly with the deputy sheriff, he was present when the intermediary called his brother and told him about Couch's conversation with Darin. Couch asserted that on the morning after his arrest, his guns were returned to him when the deputy sheriff confirmed Couch's assertion that Couch had been in communication with his brother about the discussion with Darin. Couch asserted that his motivation for contacting the law enforcement authorities was his treatment at the B & B Tavern on New Year's Eve.

The trial court ruled that the offer to prove demonstrated that Couch had agreed to cooperate with police prior to Couch's January 14, 1999 arrest. The following colloquy occurred:

> COURT: Well as far as the Court's concerned what's determinative here is that Mr. Couch went to the authorities earlier than his arrest and he went on his accord and I think you can explore that certainly but, but I'm going to deny the request for Relief from the Motion [in Limine].
>
> MR. GRAY: Thank you Your Honor. One other matter is ... I don't want to run afoul of the Court's order ... and I don't think its covered by it I don't, I will not ask him anything about his arrest for these marijuana charges however, one of the reasons that Mr. Williams asked Mr. Couch not to frequent his bar anymore was that Mr. Williams was concerned about him selling drugs inside the bar and ... I was going to explore that absent you prohibiting me from doing that?
>
> COURT: Well clearly there's no predicate for that at this point but if you can develop it why, whatever the reason was he asked him not to come back that's, I

mean that's fine. He testified why they told him not to come back so I think that's fair game.

(R. 1156).

On cross-examination of Couch, counsel for Darin thoroughly explored 1) Couch's failure to notify law enforcement authorities about the threat to Teresa before Teresa was shot; 2) Couch's failure to notify authorities about Darin's threat immediately after Teresa was shot; 3) the absurdity of attempting to deter Darin's actions by starting a "rumor" at the bar (R. 1165); 4) Couch's assertion that on New Year's Eve he immediately went to the Jamestown police station to ask if he could be thrown out of a bar for no reason and characterizing the episode as an "invitation" for further inquiry by police as to why Darin banned Couch from the property (R. 1172–73); and 5) the fact that Couch did not have a permit to carry handguns. (R. 1156).

Assuming *arguendo* that the trial court limited full exploration of possible bias by Couch and erred by doing so, the error was harmless. *See McCarthy*, 749 N.E.2d at 535–36. The above colloquy and the summary of Darin's cross-examination of Couch demonstrate that Darin was allowed wide latitude in the cross-examination that was permitted. The focus of Couch's testimony, that Darin attempted to hire Couch to kill Teresa, was cumulative of other testimony. Further, the prosecution's case is particularly strong: Teresa's eyewitness testimony and that of other witnesses provide overwhelming evidence of Darin's guilt. Darin failed to present reversible error.

### 4. Newly Discovered Evidence

Darin contends that the trial court abused its discretion by determining that he was not entitled to a new trial on the basis of newly discovered evidence. He

argues that the affidavits used at the hearing on the motion to correct error, together with the evidence by witnesses at the postconviction hearing, establish that his father shot Teresa.[11]

■ Darin filed a motion to correct error alleging newly discovered evidence before he was sentenced. He initially presented the affidavit of an attorney who performed services for his father, Michael Williams. Cole, the attorney, and Michael Williams allegedly discussed Michael Williams' role in the shooting prior to Darin's conviction.

In *Denney v. State*, 695 N.E.2d 90, 93 (Ind.1998), our supreme court observed:

Denials of a motion for a new trial are reviewed for an abuse of discretion.

Under Trial Rule 59(A), to warrant a new trial based on newly discovered evidence, the movant must show that the evidence (1) has been discovered since the trial; (2) is material and relevant; (3) is not cumulative; (4) is not merely impeaching; (5) is not privileged or incompetent; (6) was not discoverable upon due diligence in time for trial; (7) is worthy of credit; (8) can be produced on a retrial of the case; and (9) will probably produce a different result. Motions for a new trial based upon newly discovered evidence are viewed with disfavor. The movant has the burden of showing that the newly discovered evidence meets all nine prerequisites for a new trial.

*Id.* at 93 (citations omitted). The affidavit regarding Michael Williams' statements to Cole fails to meet all nine prerequisites.

In *Webster v. State*, 699 N.E.2d 266, 269 (Ind.1998), the defendant filed a motion to correct error requesting a new trial on the basis of newly discovered evidence.[12] The defendant claimed that the newly discovered evidence demonstrated that another person, who was deceased at the time of the trial, had actually committed the crime. *Id.* at 269. The motion was premised upon affidavits by relatives of the deceased. The court determined that although the trial court did not make specific findings with regard to its denial of the defendant's request for a new trial, the trial court "would have been within its discretion in deciding that 'this newly discovered evidence' was not worthy of credit." *Id.* The court noted that the witnesses could have come forward prior to the trial, and that the witnesses had connections to the defendant.

Here, we are favored with the trial court's basis for its determination. As explained by the trial court, the statements are not worthy of credit for several reasons, including: 1) Michael Williams did not claim responsibility for the shooting in his suicide note; 2) Michael Williams testified at trial and in a deposition, and stated that he was not at Teresa's home on the day the crimes were committed; and 3) in contemplation of his suicide, Michael Williams may have made statements that could assist his son.

11. Also with regard to Darin's claim of newly discovered evidence, Darin contends that the affidavit of Juror Day indicates that he was persuaded by the State's argument that the cellular telephone records indicated the location of the person making the call. We have addressed aspects of the affidavit and the telephone records in the previous issues.

12. The court in *Webster* also determined that the defendant's submission of reply affidavits could not be considered because Ind. Trial Rule 59(H)(4) states that "[n]o reply affidavits ... from the party first moving to correct errors are contemplated." *Id.* at 269 n. 2. The court's ruling in *Webster* would have an effect only on the affidavits by Rick Posha. Posha clarified that Michael Williams claimed some responsibility for the circumstances and that Michael Williams did not state that he shot Teresa. Accordingly, we will not address further Posha's affidavits.

Moreover, production of the evidence by Cole at a retrial probably would not produce a different result. As we have stated, the evidence of Darin's guilt is overwhelming.

Because the newly discovered evidence tendered by Darin did not meet all nine of the prerequisites for granting a new trial, the trial court did not abuse its discretion by failing to grant Darin a new trial on the basis of Cole's affidavit.

Darin also raised newly discovered evidence in the postconviction proceedings. As noted above, he bore the burden in the postconviction court of establishing the grounds for relief by a preponderance of the evidence. *See Dowdell,* 720 N.E.2d at 1150. Darin appeals from a negative judgment; thus, in order to gain reversal, he must demonstrate that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the postconviction court. *Id.*

 At the postconviction hearing, Darin sought to present the testimony of William Sears regarding a conversation, after Darin's conviction, that Sears had with Michael Williams about the shooting of Teresa. The State's hearsay objection was sustained. Darin urged that the testimony should be admissible pursuant to Evidence Rule 804(b)(3), regarding exceptions to the hearsay rule for unavailable witnesses, and made an offer to prove.

In the offer to prove, Sears stated that he frequented the B & B Tavern and knew Darin and Michael Williams from his business. Sears said he spoke to Darin on the telephone on the Wednesday before the verdict. Darin told Sears that the trial was going well. When Sears spoke to Michael Williams a few days after the verdict, he asked him how Darin could have committed the crimes. Sears stated that Michael Williams told him that he had shot Teresa, and that "the bitch would have been dead if the gun hadn't jammed." (Postconviction R. 169). According to Sears, Michael Williams explained that Teresa "was going to get the farm, the family farm, throw his folks off and he couldn't have that." (Postconviction R. 169). Sears stated that Michael Williams appeared emotionless and stared straight ahead when he told Sears that he shot Teresa, but that he seemed angry when he spoke about the farm. Sears visited Darin after the trial and told him of the conversation with Michael Williams.

Evidence Rule 804 defines the circumstances when a declarant is unavailable, and provides exceptions for certain statements that would be otherwise inadmissible pursuant to the hearsay rule. One such exception, as argued by Darin, exists for statements against interest:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. . . .

Evid.R. 804(b)(3).

Here, Michael Williams committed suicide six days after the conclusion of Darin's trial. Sears contended that his conversation with Michael Williams occurred after the trial. Considering the short period between Darin's conviction and Michael Williams' suicide, it is reasonable to conclude that Michael Williams contemplated the suicide at the time of the conversation with Sears, and, as noted by the postconviction court, may have desired to assist his son by claiming responsibility. Further, Michael Williams' statement, made to a business associate in contemplation of his suicide and to exonerate his son, cannot be characterized as "so far contrary" to Mi-

chael Williams' interest "that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." *See* Evid.R. 804(b)(3). Darin failed to demonstrate that the evidence leads unerringly and unmistakably to a conclusion opposite that of the postconviction court. *See Dowdell,* 720 N.E.2d at 1150.

■ Also, at the postconviction hearing, Darin presented testimony by Kristin Tyler, a former server at the B & B Tavern, regarding a conversation she had with Michael Whittaker. Whittaker testified at Darin's trial that Darin attempted to hire Whittaker to kill Teresa. At the postconviction hearing, Tyler testified that she had a conversation with Whittaker at the B & B Tavern "about a week or so after [Teresa] had been shot." (Postconviction R. 178). She stated Whittaker had told her that Michael Williams, not Darin, had approached him about killing Teresa. Tyler stated that she did not tell anyone about the conversation because she did not believe that Darin or Michael Williams could have been involved. She testified that she told Shawna Harshbarger about the conversation after she learned that Whittaker testified at trial that Darin asked him to kill Teresa.

As noted above, Darin bore the burden in the postconviction court of establishing the grounds for relief by a preponderance of the evidence. *See Dowdell,* 720 N.E.2d at 1150. Darin appeals from a negative judgment; thus, in order to gain reversal, he must demonstrate that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the postconviction court. *Id.*

One of the nine prerequisites to a new trial based upon newly discovered evidence is that the evidence "is not merely impeaching...." *See Denney,* 695 N.E.2d at 93. Tyler's testimony was directed solely at impeaching the credibility of one of the

witnesses at Darin's trial. As such, Tyler's testimony did not present evidence upon which to grant a new trial or to determine that the postconviction court's determination is opposite to that presented by the evidence.

### 5. *Double Jeopardy*

■ In his direct appeal, Darin alleged that his convictions for both attempted murder and robbery as a class A felony violate Indiana's tenets of double jeopardy. The State agrees that because the charging information elevating robbery to a class A felony depends upon the exact same conduct, *i.e.,* shooting Teresa in the head, as the attempted murder conviction, the robbery conviction must be reduced to a class B felony.

■ "[A] defendant cannot be convicted of both murder and robbery as a Class A felony when 'both the murder conviction and the enhanced robbery conviction are based on the same bodily injury to the [same] victim.'" *Grace v. State,* 731 N.E.2d 442, 446 (Ind.2000)(quoting *Hampton v. State,* 719 N.E.2d 803, 808 (Ind.1999)). In *Grace,* the court ordered the trial court to vacate the robbery conviction as to the murder victim. *Grace,* 731 N.E.2d at 446. In *Hampton,* the court reviewed the double jeopardy analysis explained in *Richardson v. State,* 717 N.E.2d 32 (Ind.1999). Quoting *Richardson,* the court stated: "if, with respect to *either* the statutory elements of the challenged crimes *or* the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense. *Id.* at 49 (emphasis in original)." *Hampton,* 719 N.E.2d at 809. The *Hampton* court determined that a reasonable possibility existed that "[t]he same evidence that supported the murder conviction, the act of stabbing, may have also been used to convict Defendant of

robbery as a Class A felony." *Id.* The *Hampton* court reduced the defendant's robbery conviction to a class C felony noting:

> Robbery as a Class C felony was charged in the State's Information and is a lesser included offense for which Defendant can be convicted. Robbery as a Class B felony, which was not charged by the State, is not necessarily a lesser included offense of robbery as a Class A felony. Thus, it is proper to reduce Defendant's conviction for robbery to a Class C felony rather than to a Class B felony.

*Id.* at n. 1.

We conclude, however, that the robbery conviction must be reduced to a class C felony, as a lesser included offense. As in *Hampton,* it is apparent that the jury relied upon evidence of the injuries to Teresa during the shooting to sustain the class A robbery designation. No other evidence of injury was presented.

Further, the circumstances here indicate that Darin did not commit the robbery in conjunction with the attempted murder, but rather that the robbery arose in an effort to disguise the nature of the shooting. Accordingly, the cause is reversed and remanded for a reduction of the conviction for robbery as a class A felony to robbery as a class C felony. Also, the cause must be remanded for resentencing based upon the lowered felony.

We affirm in part, reverse in part and remand.

FRIEDLANDER, J., concurs.

BAKER, J., concurs in part and dissents in part with separate opinion.

BAKER, Judge, concurring in part and dissenting in part.

I concur with the majority in all respects except one: whether Williams's robbery conviction must be reduced to a class C felony. I agree with the majority that convicting Williams of attempted murder and robbery as a class A felony violates constitutional protections against double jeopardy. However, the jury could have convicted Williams of robbery, as a class B felony, and attempted murder without violating his double jeopardy protections. First, the factual allegations in the charging information were sufficient to put Williams on notice to defend against the charge of robbery as a class B felony. The information charged that Williams knowingly took property from Teresa, by using force on her, "by striking her in the back of the head with a metal projectile or projectiles." Second, the jury was instructed that it could convict Williams of robbery as a class B felony.

In *Hampton v. State,* our supreme court reduced the defendant's conviction for robbery from a class A felony to a class C felony. 719 N.E.2d 803, 809 (Ind.1999). It found that Hampton's murder and class-A-felony robbery convictions were based on the same bodily injury to the victim. *Id.* at 808. The supreme court did not reduce the robbery conviction to a class B felony because robbery as a class B felony was not charged by the State and is not an inherently lesser-included offense of class-A-felony robbery. *Id.* at 809 n. 1 (citing *Kingery v. State,* 659 N.E.2d 490, 495 (Ind.1995)).

In the instant case, the charging information did not specifically cite robbery as a class B felony. But this does not end the inquiry. According to our supreme court, Indiana law recognizes two types of included offenses. First, an inherently included offense is one that a criminal necessarily commits, *by statutory definition,* in the course of committing a greater offense. *Smith v. State,* 445 N.E.2d 998, 999 (Ind. 1983). Second, the factual allegations of a charging information—*absent the statutory definition*—may support a conviction

for a lesser-included offense. *Maynard v. State,* 490 N.E.2d 762, 763 (Ind.1986).

In *Maynard,* the State charged the defendant with inflicting physical injury while in commission of a robbery. Quoting the charging information, our supreme court presented the factual allegations that the defendant:

> did ... by violence and putting [the victim] in fear, take from [the victim] ... personal property ... and, while engaged in committing the robbery aforesaid, did then and there unlawfully and feloniously inflict a physical injury, ... by striking [the victim] with a Tire Iron[.]

490 N.E.2d at 763 (alterations and omissions in original). After trial, the defendant was convicted of robbery while armed with a deadly weapon. Maynard argued that his conviction for robbery while armed with a deadly weapon was not a lesser-included offense of inflicting physical injury while in commission of a robbery. Our supreme court reasoned that, although the charging information did not recite the statutory definition "armed with a deadly weapon," the word "tire iron" was sufficient to put defendant on notice of the charge. *Id.* at 764.

The same result obtains here. As the majority correctly notes, class-B-felony robbery is not by statutory definition a lesser-included offense of class-A-felony robbery. However, the charging information contained facts that put Williams on notice of a potential class-B-felony robbery conviction. The information charged that Williams knowingly took property from Teresa, by using force on her, "by striking her in the back of the head with a metal projectile or projectiles." From these factual allegations, the jury could have convicted Williams of taking property from his victim by use of force while armed with a deadly weapon.

Likewise, the jury instructions were sufficient to convict Williams of class-B-felony robbery. In *Kingery v. State,* our supreme court reduced the defendant's robbery conviction from a class A felony to a class C felony. 659 N.E.2d 490 (Ind.1995). Our supreme court noted that Kingery could have been convicted of class B felony robbery had the jury been provided an instruction for class-B-felony robbery. *Id.* at 496. Double jeopardy did not prohibit Kingery's conviction of robbery as a class B felony—while armed with a deadly weapon—even though he was convicted of robbing and murdering the same victim. *Id.*

In the instant case, the jury was provided an instruction on convicting Williams of class-B-felony robbery:

> If the State further proved beyond a reasonable doubt that the defendant committed the crime while armed with a deadly weapon or the crime resulted in bodily injury to any person other than the defendant, you should find the defendant guilty of robbery, a Class B felony.

R. at 182. Because Williams was armed with a deadly weapon, double jeopardy protections do not prohibit convicting Williams of class-B-felony robbery and attempted murder. Therefore, I vote to remand the cause to reduce the robbery conviction from a class-A to a class-B-felony conviction and for appropriate resentencing.