Virgil HALL, III, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 27A02–0207–CR–538.

Court of Appeals of Indiana.

Sept. 30, 2003.

Mark Small, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Monika Prekopa Talbot, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

Virgil Hall III ("Hall") was convicted of murder, a felony,[1] and neglect of a dependent resulting in serious bodily injury, as a Class D felony,[2] in Grant Circuit Court. Hall was sentenced to sixty-five years executed in the Department of Correction for murder and three years for neglect of a dependent resulting in serious bodily injury, with the sentences to run concurrently. Hall appeals, raising the following restated issues:

I. Whether the trial court abused its discretion when it denied Hall's Motion to Correct Error;

II. Whether the trial court abused its discretion when it limited Hall's cross-examination of the victim's mother;

III. Whether the trial court abused its discretion when it excluded testimony of Hall's medical expert;

IV. Whether the trial court abused its discretion when it denied Hall's Motion for a Mistrial; and,

V. Whether the trial court erred when it denied Hall's Verified Motion for the Appointment of a Special Prosecutor.

Concluding that Hall has failed to meet his burden under these theories, we affirm.

### Facts and Procedural History

In December of 1999, Hall married Kelli Fetterhoff ("Fetterhoff"), the mother of three-year-old Peyton Fetterhoff ("Peyton") and five-year-old Hunter Fetterhoff ("Hunter"). Four months thereafter, Hall and Fetterhoff had a son, Devon Hall ("Devon").

On the morning of May 25, 2000, Fetterhoff went into town to run errands with Devon, while Hall stayed home to do lawn work and watch over Peyton and Hunter. At 11:04 a.m., Hall called Ted Flannigan, the deputy chief of the Mill Township Fire Department, and asked for assistance because Peyton "fell off a swing." Tr. p. 234. When Ted Flannigan arrived, he was immediately concerned that Peyton's situation was serious and told Hall to call an ambulance. Tr. pp. 244–45. Hall called an ambulance and informed the dispatcher that his child fell off a swing. Tr. p. 168.

---

1. Ind.Code § 35–42–1–1 (1998).

2. Ind.Code § 35–46–1–4 (1998).

Peyton was transported to Marion General Hospital, where he was examined by Dr. Jeffrey Yablong ("Dr. Yablong"). Hall also advised Dr. Yablong that Peyton fell off a swing. Tr. p. 288. Dr. Yablong observed that Peyton had a number of obvious and severe injuries; Peyton was non-responsive to commands, lethargic, had a fracture on his skull, a large amount of swelling, noticeable injuries to his torso, and deviated eyes.

Due to the severity of Peyton's injuries, he was taken by helicopter to Riley Hospital in Indianapolis. Peyton's condition was critical when he arrived; he was not moving and had low blood pressure and a high heart rate. Peyton eventually died because his brain became so swollen that its blood supply was cut-off.

Dr. Dean Hawley ("Dr. Hawley") performed Peyton's autopsy. Peyton's autopsy revealed that he had suffered at least three separate injuries to his head, one on each side and one on the back. Tr. p. 664. The autopsy also revealed that Peyton had a laceration to the ligament that holds his head to his cervical spine, a severe injury to his chest, another injury to his abdomen, and yet another severe injury to his scrotum. Tr. p. 356.

On June 5, 2000, Hall was charged by information with murder, a felony. On December 29, 2000, the State added a neglect of a dependent resulting in serious bodily injury, as a Class B felony, count to Hall's charging information.

While Hall awaited trial, he was incarcerated in the Grant County Jail. During Hall's incarceration, the Gas City Police Department sought and received permission from Chief Deputy Prosecutor Jim Luttrell ("Luttrell") to intercept Hall's phone conversations. When Luttrell authorized this interception, he believed that the jail had the practice of notifying inmates during booking that their phone

conversations were subject to being recorded; however, after Hall's phone conversations already had been recorded, jail officials and Luttrell learned that this notification procedure was not in place when Hall was booked. Tr. pp. 28–29, 34–35.

As a consequence of the unauthorized interception of his phone conversations, Hall commenced civil proceedings against those responsible, including Luttrell, and filed a verified motion for the appointment of a special prosecutor. The trial court denied Hall's motion, but prudently suppressed all evidence obtained as a result of the interception of Hall's phone conversations.

Before trial, the State filed a motion in limine, seeking to exclude alleged testimony indicating that Fetterhoff struck Peyton in the head on the morning of his death. The trial court granted this motion.

Jury trial began on February 6, 2001. During trial, the State objected to a portion of the testimony offered by Hall's medical expert, Dr. Lawson Bernstein ("Dr. Bernstein"). The trial court excused the jury and held an evidentiary hearing on the admissibility of Dr. Bernstein's testimony. After the hearing, the trial court held Dr. Bernstein's testimony inadmissible because of his limited expertise. Tr. pp. 1340–44.

At trial, Hall recanted his initial explanation of Peyton's injuries. Hall testified that he had placed Peyton on a workbench and, while he was using his electric weed eater, pulled on the weed eater's extension cord to unloosen a kink in the cord. Tr. pp. 923–26. Hall stated that as he pulled on the cord, he accidentally struck Peyton, who was sitting behind him, knocking Peyton off the bench, and causing Peyton to hit a dog cage before hitting the floor. Tr. p. 926. Hall claimed the reason he told

doctors and emergency personnel Peyton fell off a swing was because he was afraid people would feel he was not a responsible parent if the truth were known. Tr. pp. 937–47.

During trial, the State produced evidence from several doctors that indicated Peyton's injuries were inconsistent with those caused from falling off a swing. Tr. pp. 292, 337–38, 763. Also, Dr. Tres Scherer ("Dr. Scherer"), a pediatric surgeon who examined Peyton at Riley Hospital, testified that (1) Peyton's injuries were similar to those caused by intentional trauma, (2) a fall from a table, then to another object, and then to the floor would not be capable of causing Peyton's injuries, and (3) Peyton's injuries were consistent with having been inflicted contemporaneously on the morning of the day he was treated at Riley Hospital. Tr. pp. 340, 343, 361.

Dr. Thomas G. Luerssen ("Dr. Luerssen"), a pediatric neurosurgeon who also examined Peyton at Riley Hospital, testified that a fall of five or six feet may be able to fracture a child's skull but would not be capable of harming a child's brain and only a fall from an extreme height—one to two stories—could have caused the type of brain injury Peyton received. Tr. pp. 424–25, 435.

Dr. Hawley, who performed Peyton's autopsy, testified that injuries similar to Peyton's laceration of the ligament that holds his head to his cervical spine typically occur when the head is thrown violently forward and Peyton's injuries to his chest, abdomen, and scrotum were consistent with those caused by punches or kicks. Tr. pp. 658, 665, 679, 681.

Hall called a photogrammetry expert to testify about the width of the bars on the dog cage that Peyton allegedly hit as he allegedly was falling from the workbench. This expert testified that the width of the injuries on Peyton's head were consistent with the width of the bars on the dog cage. Tr. pp. 1072, 1171. The following exchange, concerning this testimony, occurred during Luttrell's closing rebuttal argument:

State: *Oh, and by the way, these posts that are three-eighths of an inch wide. Hmmm. Well ...*

Hall: Your Honor. We'll object ... [the] witness has already testified to [the] measurements ... we demand a mistrial. He cannot testify.

Court: Overruled. This is not testimony; it's final argument.

State: Don't they have the same measurements in Canada? *Isn't an eighth of an inch the same here as it is in Canada?*

Tr. pp. 1502–03 (emphasis added).

The jury found Hall guilty of murder, a felony, and neglect of a dependent resulting in serious bodily injury, as a Class B felony. The trial court sentenced Hall to sixty-five years in the Department of Correction for murder, a felony, and three years for neglect of a dependent, as a Class D felony, with the sentences to run concurrently.

On April 5, 2001, Hall filed a motion to correct error. An affidavit was attached to this motion alleging jury misconduct. The affidavit specified that during trial juror David Daniels ("Daniels") told alternate juror Gary Hopkins ("Hopkins") that Daniels' stepson was incarcerated with Hall and believed Hall to be innocent. Appellant's Supp. App. pp. 302–03. At a later stage of trial, Daniels' stepson and the other inmates changed their opinion and, by this time, believed Hall to be guilty. *Id.* Although the inmates' subsequent opinions were not communicated directly to Daniels, they were relayed to Daniels' wife, and Daniels overheard his wife giving this information to another family member.

*Id.* at 319. Daniels conveyed this information to the remainder of the jury during deliberations. Appellant's App. pp. 24, 37.

After Hall filed his Motion to Correct Error, he moved to depose the jury. The trial court denied this motion. This ruling was certified for interlocutory appeal, and this court affirmed. *See Hall v. State,* 760 N.E.2d 688 (Ind.Ct.App.2002), *trans. denied.* On May 22, 2002, the trial court denied Hall's Motion to Correct Error. Hall now appeals.

## I. Jury Misconduct

■ A party may file a motion to correct error when there is newly discovered evidence, such as alleged jury misconduct. *Mitchell v. State,* 726 N.E.2d 1228, 1238 (Ind.2000). The decision to deny a motion to correct error lies within the trial court's sound discretion. *Griffin v. State,* 754 N.E.2d 899, 901 (Ind.2001). An abuse of discretion occurs when the denial of a motion to correct error is clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions following therefrom. *Hall,* 760 N.E.2d at 690.

A. *Under current Indiana law, the burden of proving prejudice is on the defendant.*

■ In *Griffin,* our supreme court declined to overturn a conviction despite a claim that—upon request during deliberations—an alternate juror expressed her belief, supported by her reasoning, that the defendant was guilty. 754 N.E.2d at 900. In so holding, *Griffin* stated, "juror misconduct involving an out-of-court communication with an unauthorized person creates a rebuttable presumption of prejudice."[3] 754 N.E.2d at 901 (citing *Currin v. State,* 497 N.E.2d 1045, 1046 (Ind.1986)). However, *Griffin* then continued, "[a] defendant seeking a new trial because of juror misconduct must show that the misconduct (1) was gross and (2) probably harmed the defendant." *Id. Griffin* concluded by noting, *"[the defendant] has not shown . . . probable harm.* The trial judge therefore acted within the bounds of his discretion in denying relief based upon juror misconduct." *Id.* at 903 (emphasis added).[4]

Cases other than *Griffin* have "applied" *Currin's* presumption of prejudice in much the same manner. *Butler v. State* upheld a conviction despite an assertion that a juror learned, by way of an extrinsic communication, that someone fired a gun at a State witness. 622 N.E.2d 1035, 1039 (Ind.Ct.App.1993), *trans. denied.* In so holding, *Butler* stated:

> In general, a rebuttable presumption of prejudice arises from juror misconduct involving out-of-court communications. *Currin v. State,* [497 N.E.2d 1045, 1046 (Ind.1986) ]. Such misconduct must, however, be based on proof, by a preponderance of the evidence, that the extra-judicial contact or communication actually occurred and that it pertained to a matter before the jury. *Id.* This is a threshold inquiry that must first be established before the trial judge may consider the presumption [of prejudice] . . . Once the defendant has established to the satisfaction of the trial court that improper contact occurred and that it

---

**3.** If a presumption of prejudice arises, *the defendant need not prove prejudice* and the onus would be entirely upon the State.

**4.** It is tempting to reconcile *Currin* and *Griffin* by asserting that *Griffin* created a two-tiered standard. However, under such an interpretation, the only way a defendant could receive the presumption of prejudice is by first proving he or she was prejudiced; such a presumption is clearly illusory.

pertained to a matter before the jury, the presumption [of prejudice] arises and the burden shifts to the State for rebuttal. *Then, upon consideration of all the evidence, the trial court must be convinced that a substantial possibility existed that the verdict was prejudiced by the improper material before a reversal and a new trial will be granted.* *Id.* (emphasis added) (citations omitted).

To erase any doubts as to which party *Butler* placed the burden of proof, *Butler* stated, "while [the defendant] may have met his initial burden, *he did not demonstrate* to the trial court a substantial possibility that the jury was improperly influenced." *Id.* at 1040–41 (emphasis added); *see also Williams v. State,* 757 N.E.2d 1048, 1060–61 (Ind.Ct.App.2001), *trans. denied* (stating, "[m]oreover, even if [the defendant] had presented evidence to shift the burden to the State, *he has failed to demonstrate* that the potential misconduct was gross or *constituted probable harm*")

**5.** Because of the nature of the communications involved in all of these cases, we believe that—unlike the case at bar—the outcome of these cases would have been the same regardless of the burden of proof.

**6.** We find it significant that the "evolution" of *Currin*'s presumption of prejudice appears to have been inadvertent. *Currin,* 497 N.E.2d at 1046, states,

> While a rebuttable presumption of prejudice arises from jury misconduct involving out-of-court communications with unauthorized people ... such misconduct must be based on proof, by a preponderance of the evidence, that an extra-judicial contact or communication occurred, and *that it pertained to a matter pending before the jury.* *Id.* (emphasis added). *Butler*—citing *Currin*—restated this proposition, but then added, "upon consideration of all of the evidence, the trial court must be convinced that a substantial possibility existed that the verdict was prejudiced by the improper material before a new trial will be granted," effectively shifting the burden of proof back to the defendant. *Butler,* 622 N.E.2d at 1040 (citing *Bockting v.*

(emphasis added).[5] All of these cases state the presumption of prejudice as black letter law and then proceed to ignore it.[6]

B. *The burden of proving the lack of prejudice should be on the State*

Under the Sixth Amendment, every defendant must be afforded the opportunity to conduct an effective cross-examination of the State's witnesses. *Kilpatrick v. State,* 746 N.E.2d 52, 59 (Ind.2001). This right "extends to situations related to the presentation of evidence or witnesses, during which the right of cross-examination is implicated." *Id.* When a defendant is denied this opportunity, his conviction will be reversed unless *the State* can prove *beyond a reasonable doubt* that the denial did not contribute to the verdict obtained. *Standifer v. State,* 718 N.E.2d 1107, 1110–11 (Ind.1999) (citing *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).

*State,* 591 N.E.2d 576, 579 (Ind.Ct.App. 1992)).

*Bockting*'s holding concerned juror consultation of a medical dictionary—a form of misconduct that Indiana courts have long recognized does not require the State to prove that the defendant was not harmed by such a consultation. *Bockting,* 591 N.E.2d at 579; *see also South Bend Clinic, Inc. v. Kistner,* 769 N.E.2d 591, 592–93 (Ind.Ct.App.2002); *Shultz v. State,* 417 N.E.2d 1127, 1134 (Ind. Ct.App.1981).

Beginning with *Butler,* current case law—without explicitly overruling *Currin*—has dispensed with *Currin*'s requirement that the extrinsic communication "pertain to a matter pending before the jury," added the requirement that "the defendant show that the misconduct was gross and probably harmed the defendant," and, in so doing, has inadvertently negated *Currin*'s presumption of prejudice. *See Griffin,* 754 N.E.2d at 901; *Stephenson v. State,* 742 N.E.2d 463, 477–78 (Ind.2001); *Williams,* 757 N.E.2d at 1059. *Contra May v. State,* 716 N.E.2d 419, 421 (Ind.1999).

We find it inconsistent and troubling that when a defendant is not allowed to confront evidence in an open courtroom—where he or she at least has the opportunity to hear the evidence presented and, consequently, has the ability to conduct his or her defense in a manner that might compensate for the damaging evidence—Indiana law requires *the State* to prove *beyond a reasonable doubt* that the error was harmless. Yet, under Indiana's current jury misconduct standard, when a defendant is not allowed to confront evidence because extrinsic information reached the jury—which the defendant may not even be aware of and, consequently, will be unable to conduct his or her defense in a manner that compensates for the extrinsic information—Indiana law requires *the defendant* to prove that he or she has been prejudiced by the evidence.

For all of these reasons we respectfully assert that the State should bear the burden of proving that Hall was not prejudiced by the extrinsic communications.[7] However, because mandatory precedent clearly places the burden of proving prejudice on the defendant, we require Hall to prove he was prejudiced by the misconduct.

C. *Hall failed to meet his burden of proving prejudice*

 1. *Extrinsic information reached the jury during deliberations*

■ When evaluating jury misconduct, we consider juror affidavits to the extent they assert the deliberations were tainted by improper influence. *Majors v. State*, 773 N.E.2d 231, 234 n. 1 (Ind.2002). Daniels told Hopkins that his stepson was incarcerated with Hall and believed Hall to be innocent. Appellant's App. p. 23. Hopkins' affidavit also indicates that, during deliberations, Daniels informed the remainder of the jury that his wife had a subsequent conversation with his stepson and his stepson had changed his previous opinion and now believed Hall to be guilty. *Id.* at 24. Daniels' own affidavit corroborates Hopkins' claims. *Id.* at 37. These two affidavits clearly indicate that extrinsic communications concerning a contested matter reached Hall's jury during deliberations. *See Hall*, 760 N.E.2d at 692.

 2. *How prejudice is measured*

Hall asserts, and we agree, that the State converts the determination of proving prejudice into a sufficiency test and such a conversion is not supported by Indiana law. Reply Br. of Appellant at 5–6. Little, if any, guidance is provided on this issue by jury misconduct cases; however, we find harmless error analysis instructive.

*Ground v. State* notes:

It may seem anomalous that we are reversing [the defendant's] convictions based on harmless error analysis but concluding, at the same time, that the remaining evidence is sufficient to support her convictions. Based on the sufficiency of the evidence, one could argue [the defendant] was not prejudiced by the improperly admitted evidence.

---

**7.** As will be discussed below, the burden of proof is absolutely pivotal in this case. If we were to place the burden of proof on the State, where we believe it properly belongs, Hall would prevail on this issue and be entitled to a new trial. We neither take lightly the impact that such a decision would have on a case involving the murder of a three-year-old nor do we envy the task of our su-preme court, should they grant transfer to resolve this issue. Nonetheless, we believe it would be far better for all concerned that Hall's conviction be vacated at such a juncture than at a subsequent one—when memories will have faded and Peyton's survivors would be faced with the unpleasant task of revisiting his loss after having a significant amount of time to heal.

However, the test for harmless error serves a different function than the test for sufficiency of the evidence. The harmless error test seeks to determine the probable impact of the error on the jury, and its effect on the rights of the party. The sufficiency of the evidence test seeks to determine if substantial evidence of probative value exists from which a reasonable trier of fact could find guilt beyond a reasonable doubt. 702 N.E.2d 728, 733 n. 4 (Ind.App.1998); *see also Saperito v. State*, 490 N.E.2d 274, 278 (Ind.1986) ("of course, the test for harmless error is not whether the evidence was sufficient without the offending testimony, but whether the testimony might have had a substantial effect on the verdict"); *Griffin v. State*, 664 N.E.2d 373, 377 (Ind.Ct.App.1996) ("while there may exist substantial evidence of [the defendant's] guilt, we determine that the excluded evidence's probable impact on the jury, in light of the evidence in the case, affected [the defendant's] substantial rights").

▪ The test for harmless error is not whether there was substantial evidence of the defendant's guilt but whether the error contributed to the verdict.[8] We adopt this approach for jury misconduct cases involving extrinsic communications because: (1) like harmless error analysis, jury misconduct review seeks to protect the defendant's rights (impartial jury and confrontation), not to determine the sufficiency of the evidence, and (2) sufficiency cases affirm verdicts unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Tyson v. State*, 766

N.E.2d 715, 717–18 (Ind.2002). The application of such a sufficiency-affirming standard would not necessarily be reliable for the purpose of determining actual prejudice because reasonable people have been known to disagree about such matters—as is evidenced by dissenting opinions.

### 3. *Information that may be considered in determining prejudice*

▪ When determining whether an extrinsic communication has prejudiced the defendant, we consider juror affidavits only to the extent they assert the deliberations were tainted by improper information and are precluded from considering any information, contained within the juror affidavits, indicating how the extrinsic information affected the jury's decision-making process. *Hall*, 760 N.E.2d at 691. As such, we must disregard Daniels' self-serving statement indicating that his stepson's communication in no way affected his verdict and make an independent determination of the likely effect of the communications. Appellant's App. p. 37.

### 4. *Review of the evidence and application of the current standard.*

▪ *Hall* stated, "[i]n most instances it is difficult, if not impossible, to assess the impact of extraneous information of influences without somehow gaining insight into the individual juror's reaction to the information or outside influence." 760 N.E.2d at 692 n. 2.

---

**8.** Substantial *independent* evidence may be used to demonstrate that an error did not contribute to the verdict. *Meadows v. State*, 785 N.E.2d 1112, 1122 (Ind.Ct.App.2003), *trans. denied*. To determine whether the error contributed to the verdict, we determine whether the error was unimportant in relation to everything else the jury considered on the issue in question. *Id.* An error pervading every aspect of deliberations cannot be said to have been unimportant in relation to everything else the jury considered on the issue in question.

When the extraneous information at issue is merely cumulative, strikes the court as being so inherently unreliable as likely to be rejected by the jury, or does not concern a central issue of the case, a court may be able to assert with confidence that the defendant was not prejudiced by the information. However, when, as here, the extraneous information concerns a central issue of the case—Hall's actual guilt—or fairly can be expected to pervade every aspect of the jury's deliberations, *Hall's* analysis is irrefutable. Because of the rule precluding consideration of juror testimony regarding the impact of the extraneous information on the verdict, reviewing courts are confronted with a dearth of evidence and are, consequently, ill equipped to determine whether jurors confined their deliberations to properly admitted evidence or allowed the extraneous information to affect their verdict. For this reason, the placement of the burden of proof is *everything*.[9]

In the case at bar, the extraneous information concerned Hall's fellow inmates' opinions of his innocence and guilt. The fact that the inmates lived with Hall and once believed he was innocent, but changed their belief to guilt, renders the impression that the inmates had a special insight into Hall's guilt—seemingly gained as a result of their frequent contact with Hall and ability to see Hall when he had not composed himself for a jury. As such, if the jury allowed themselves to consider this information, there can be little doubt that the information had a prejudicial impact on the verdict obtained. However, as

suggested, or perhaps even predicted, by *Hall*, 760 N.E.2d at 692 n. 2, the dearth of evidence and our consequent inability to gain an insight into the jury's motivations leaves us at a loss in determining whether Hall's jury considered the extraneous information. Because there is no evidence in the record to make this determination, Hall, as the party with the burden of proof under current Indiana law, necessarily loses.

## II. Hall's Cross-examination of Fetterhoff

 The admission of evidence is within the sound discretion of the trial court, and a decision to admit evidence will not be reversed absent a showing of an abuse of that discretion resulting in the denial of a fair trial. *Simmons v. State*, 760 N.E.2d 1154, 1158 (Ind.Ct.App.2002). Generally speaking, relevant evidence is admissible and irrelevant evidence is inadmissible. *Majors v. State*, 748 N.E.2d 365, 368 (Ind.2001). Relevant evidence is evidence having any tendency to make the existence of a fact that is of consequence to the determination of an action more or less probable than it would be without the evidence. *Majors*, 748 N.E.2d at 368.

Hall sought to admit alleged evidence of Fetterhoff striking Peyton on the morning of his death as a means of establishing an alternate cause of death. Br. of Appellant at 18. However, medical testimony demonstrated that Peyton's injuries were inflicted contemporaneously. Tr. pp. 234, 361. As such, a single alleged blow, separated in time from Peyton's other injuries, is extremely unlikely to have caused Pey-

---

**9.** Hall correctly asserts that the trial court's pre-deliberation instruction to the jurors, ordering them "to disregard any and all information that [they] may have derived from an outside source," should be of no consequence in this determination. Appellant's App. p. 19. This "curative instruction" was not prompt, was given before the extrinsic information

reached the majority of the jury, and failed to refer to the extraneous communication at issue. If this instruction were sufficient to cure the prejudicial impact, all of the above-cited case law would have been unnecessary, as this regularly given instruction would make all prejudice analysis unnecessary.

ton's death. Furthermore, Hall himself maintains that Peyton received his injuries while he was alone with Peyton. Tr. pp. 926–28. Thus, even if it were unrefuted that Fetterhoff struck Peyton on the morning of his death, her alleged blow almost certainly was not the cause of Peyton's death and, thus, is irrelevant to the determination of this case.[10] The trial court was therefore well within its discretion when it held evidence of Fetterhoff allegedly striking Peyton inadmissible.[11]

### III. The Exclusion of Dr. Bernstein's Testimony

■■■■ Indiana Evidence Rule 702 provides that a witness may be qualified as an expert by virtue of the witness' "knowledge, skill, experience, training, or education." *Kubsch v. State*, 784 N.E.2d 905, 921 (Ind.2003). Only one of the above characteristics is necessary to qualify an individual as an expert. *Id.* Expert scientific testimony is admissible if (1) it satisfies the above standard, (2) the scientific principles upon which the expert testimony rests are reliable, and (3) the testimony's probative value is not substantially outweighed by the danger of unfair prejudice. *Haycraft v. State*, 760 N.E.2d 203, 210 (Ind.Ct.App.2002), *trans. denied* (quoting *Smith v. State*, 702 N.E.2d 668, 672 (Ind. 1998)). It is within the trial court's sound discretion to decide whether a person qualifies as an expert witness. *Corbett v. State*, 764 N.E.2d 622, 628 (Ind.2002).

### A. Dr. Bernstein's testimony was improperly excluded

■■■ The trial court rejected Dr. Bernstein's testimony concerning his theory of the cause of Peyton's death, because Dr. Bernstein (1) did not see Peyton's computerized tomography scan ("CT scan"), (2) neither attended nor saw Peyton's autopsy, (3) does not conduct autopsies himself, and (4) failed to consider, or at least adequately explain, why other factors were not the cause of Peyton's death. Tr. p. 1343.

The State concedes that reviewing the radiology report of the CT scan, as Dr. Bernstein did, is more helpful to a physician than reviewing the CT scan itself and that an expert witness need not attend an autopsy to form an opinion as to the cause of a person's death. Br. of Appellee at 16. However, the State asserts that the fact Dr. Bernstein did not see Peyton and does not do autopsies renders his opinion speculative. *Id.*

The State cites *Ind. Mich. Power Co. v. Runge*, 717 N.E.2d 216, 237 (Ind.Ct.App. 1999), in support of its position. Br. of Appellee at 16. *Runge*'s exclusion was based on the "bald" assertions of a witness concerning the effect of "electromagnetic fields" on the human body. 717 N.E.2d at 231, 237. Dr. Bernstein's offered testimony did not consist of "bald" assertions and

---

**10.** Hall cites *Saylor v. State*, 559 N.E.2d 332, 335 (Ind.Ct.App.1990), *trans. denied*, and *Hendricks v. State*, 554 N.E.2d 1140 (Ind.Ct.App. 1990), *aff'd in part*, 562 N.E.2d 725 (Ind. 1990), as standing for the proposition that he had a right to the unencumbered cross-examination of Fetterhoff. Br. of Appellant at 17–18. In *Saylor*, the right to cross-examination was based upon "infirmities in the witness' testimony." *Saylor*, 559 N.E.2d at 335. In *Hendricks*, the right to cross-examination was based upon the defendant's ability to show "bias" on the part of the State's witness. *Hendricks*, 554 N.E.2d at 1143. Bias and

infirmities in testimony are always relevant; exploration of a theory expounding an impossible cause of death and contradicting the defendant's own theory of the case is not.

**11.** Even if Hall had shown the exclusion of this alleged evidence to be improper, the exclusion would have been harmless. One would think that testimony alluding to Peyton's misbehavior on the morning of his death to be evidence that Hall would be more than willing to allow the State to exclude.

concerned a subject matter far less speculative than the effect of electromagnetic fields on the body.

Dr. Bernstein testified that his practice involved regularly reviewing the records of neurological and general trauma patients similar to the records he examined for this case. Tr. pp. 1273, 1327. As *Birdsell v. United States* stated, "with the increased division in modern medicine, the physician making the diagnosis must necessarily rely on many observations and tests performed by others; records sufficient for diagnosis in a hospital ought be enough for opinion testimony in the courtroom." 346 F.2d 775, 779–80 (5th Cir.1965); *see also Ealy v. State*, 685 N.E.2d 1047, 1056 (Ind.1997) ("[w]e have long held it proper for an expert to give an opinion based upon an autopsy report prepared by another"). The fact that a qualified physician, who does not conduct autopsies, relied on the autopsy and radiology reports prepared by others rather than inspecting the victim himself should be of no importance in the determination to exclude the offered testimony of Dr. Bernstein. As for the trial court's determination that Dr. Bernstein's testimony does not adequately explain why other factors were not the cause of death, the very purpose of Dr. Bernstein's testimony was to illustrate that the cause of death theorized by the State was incorrect because his theory, allegedly, represented the actual cause of death.

Under these facts and circumstances, although the factors proffered by the trial court may be a valid ground for discrediting Dr. Bernstein's testimony on cross-examination, using them to exclude Dr. Bernstein's testimony amounted to an abuse of discretion.[12]

---

**12.** We concur and sympathize with the trial court's statement indicating that the State's objection should have been raised in a pretrial Indiana Evidence Rule 104 motion, and

### B. *Indiana Harmless Error*

■ Errors in the admission or exclusion of evidence are to be disregarded as harmless unless they affect the substantial rights of a party. Ind. Trial Rule 61; *Hardin v. State*, 611 N.E.2d 123, 131 (Ind. 1993); *see also Fleener v. State*, 656 N.E.2d 1140, 1141–42 (Ind.1995). Considering all of the evidence in the case, we find the error limiting Dr. Bernstein's testimony sufficiently minor so as not to have affected Hall's substantial rights. Peyton's treating physician and the pathologist who performed Peyton's autopsy both testified that Peyton died as a result of multiple blunt force trauma. In light of the concurring testimony of the physicians who treated Peyton and performed his autopsy, it is unlikely that the jury would have found that Peyton died from a different cause. Tr. pp. 348–51, 683–89. For this reason, we conclude that the error excluding Dr. Bernstein's theory of Peyton's death did not interfere with Hall's substantial rights.

### IV. Prosecutorial Misconduct

■ A mistrial is an extreme remedy granted "only when there is no other method which can rectify a situation." *Oliver v. State*, 755 N.E.2d 582, 585 (Ind. 2001). The denial of a mistrial lies within the trial court's sound discretion. *Gill v. State*, 730 N.E.2d 709, 712 (Ind.2000). The trial judge is in the best position to gauge the surrounding circumstances and the potential impact on the jury when deciding whether a mistrial is appropriate. *Id.*

■ When reviewing a claim of prosecutorial misconduct, we determine (1) whether the prosecutor engaged in miscon-

---

question whether the trial court would have made the same ruling had it not been placed under time constraints by the State's open-court objection. Tr. p. 1261.

duct, and, if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected. *Booher v. State*, 773 N.E.2d 814, 817 (Ind.2002). The gravity of the peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct. *Id.*

■■■ During closing arguments, the following exchange occurred:

State: *Oh, and by the way, these posts that are three-eighths of an inch wide. Hmmm. Well . . .*

Hall: Your Honor. We'll object . . . [the] witness has already testified to [the] measurements . . . we demand a mistrial. He cannot testify.

Court: Overruled. This is not testimony; it's final argument.

State: Don't they have the same measurements in Canada? *Isn't an eighth of an inch the same here as it is in Canada?*

Tr. pp. 1502–03 (emphasis added).

It is not altogether clear what Luttrell was referring to when he mentioned "an eighth of an inch," and it is difficult to make such a determination without the aid of a visual record. However, if Luttrell were asserting that the dog cage bars were not three-eighths of an inch wide, as testified to by Hall's expert witness, and that the bars were an eighth of an inch wide based solely on the measurement that he conducted during his closing rebuttal argument, such an assertion would amount to testimony and, thus, was improper.

Hall asserts that Luttrell's comment was prejudicial to him because it undermined his theory that Peyton accidentally was knocked off the workbench and, during his fall, hit a dog cage before hitting the floor. Br. of Appellant at 25. However, even had

Luttrell not made this comment, a reasonable juror would nonetheless either (1) reject Hall's claim that Peyton hit the dog cage as the result of an accidental fall or (2) conclude that Peyton's injuries were the result of Hall intentionally driving Peyton's head into the dog cage.

Peyton suffered at least six separate injuries. Tr. pp. 356, 664. Hall's theory, even if it were not completely contradicted by the evidence, only accounts for three of Peyton's six injuries—one injury resulting from having been knocked off the workbench, one injury resulting from hitting the dog cage during his fall, and the final injury from hitting the floor. Hall's theory's failure to adequately account for Peyton's other injuries would cause any rational juror to reject his theory regardless of Luttrell's comments. The trial court did not abuse its discretion when it denied Hall's Motion for a Mistrial.

## V. Hall's Motion for a Special Prosecutor

Indiana Code section 33–14–1–6 states:

(b) A circuit or superior court judge:

(2) may appoint a special prosecutor if:

(A) a person files a verified motion requesting the appointment of a special prosecutor; and

(B) the court, after:

(i) notice is given to the prosecuting attorney; and

(ii) an evidentiary hearing is conducted at which the prosecuting attorney is given an opportunity to be heard;

finds by clear and convincing evidence that the appointment is necessary to avoid an actual conflict of interest or there is probable cause to believe that the prosecutor has committed a crime.

Ind.Code § 33–14–1–6 (1996).

■■■ Hall asserts that Luttrell's approval of the jail's request to intercept his

phone conversations violated Indiana Code section 35–33.5–5–5(c) and 18 U.S.C. section 2511. Indiana Code section 35–33.5–5–5(c) states, "[a] person who, (1) by virtue of the person's employment or official capacity in the criminal justice system, (2) knowingly or intentionally uses or discloses the contents of an interception (3) *in violation of this article* commits unlawful use or disclosure of an interception, a Class C felony." Ind.Code § 35–33.5–5–5(c) (emphasis added). Though Hall has met his burden of demonstrating the "official capacity in the criminal justice system" and "use of an interception" elements, he fails to direct us to a section of Article 35–33.5–5 that was intentionally violated by Luttrell. Br. of Appellant at 27–28. Thus, Hall has failed to establish that Luttrell violated Indiana Code section 35–33.5–5–5(c).

18 U.S.C. section 2511 provides that it is a violation of federal law for any person to *intentionally* intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication. 18 U.S.C. § 2511 (2000) (emphasis added). 18 U.S.C. section 2511 also provides that it is not unlawful to intercept a communication where one of the parties to the communication has given prior consent for such interception. 18 U.S.C. § 2511(2)(c) (2000).

When Luttrell authorized the interception of Hall's phone conversations, he did so with the understanding that the jail was notifying inmates that their phone conversations were subject to interception. Tr. p. 28–29, 34–35, 64. Thus, Luttrell's authorization was premised upon a belief of consent—provided as a defense under 18 U.S.C. section 2511(2)(c). Luttrell's mistaken belief does not satisfy 18 U.S.C. section 2511's requisite mens rea of "inten-

tionally," and the trial court did not err in rejecting Hall's claim.

Finally, the State notes, "[i]t is not clear, and indeed, [Hall] does not elaborate on why his possible cause of action against the prosecutor's office would cause a conflict of interest here." Br. of Appellee at 19. We agree. Hall provides absolutely no argument in support of this position. As such, we reject Hall's claim and conclude that the trial court did not err when it denied Hall's Motion for a Special Prosecutor.

### Conclusion

Hall has failed to meet his burden in all of the issues he has raised. Accordingly, we affirm.[13]

MAY, J., concurs.

KIRSCH, J., concurs in result with opinion.

KIRSCH, Judge, concurring in result.

I fully concur in the decision of the majority as to all issues except for the exclusion of the defendant's medical expert. I believe the trial court was within its discretion to exclude the proffered testimony and that the defendant failed to preserve any error in its exclusion by failing to make an offer to prove. Therefore, I concur in the result reached by the majority.

The trial court did an exemplary job of wrestling with the difficult issue of exclusion of scientific testimony which was raised in the midst of trial. The transcript reflects the court's extensive legal research and analysis which caused it to conclude that the proffered testimony did not meet the standards for scientific reliability set forth in Ind. Evid. Rule 702(b). I

---

13. Hall's motion for oral argument is hereby denied.

believe the trial court was acting within its sound discretion in doing so.[14]

14. The majority finds the exclusion of the scientific evidence to be harmless error. Were I to agree that the exclusion was error, I would have serious reservations as to whether the exclusion was harmless beyond a reasonable doubt. If the exclusion of the evidence was error, then the proffered evidence was based upon scientifically reliable principles. The excluded testimony would have, insofar as I can determine, put evidence of an alternative cause of death before the jury. Can excluding scientifically reliable evidence of an alternative cause of death in a murder trial be error that is harmless beyond a reasonable doubt?