**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Dec 31 2012, 11:47 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MATTHEW J. McGOVERN**
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MICHAEL GENE WORDEN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| SHAWN D. JACO, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 82A01-1203-CR-104 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE VANDERBURGH CIRCUIT COURT
The Honorable Kelli E. Fink, Judge
Cause No. 82C01-1011-FB-1353

**December 31, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BAILEY, Judge**

## Case Summary

Following the denial of his motion to correct error, Shawn D. Jaco ("Jaco") challenges his convictions for Aggravated Battery, a Class B felony,[1] and Criminal Confinement, as a Class C felony.[2]  We affirm.

## Issues

Jaco presents four issues for review:

I.      Whether he was entitled to a mistrial after a police officer testified that she had believed the victim when taking her crime report;

II.     Whether fundamental error occurred when the officer testified that she had responded to an earlier call at the same address to provide transportation for another alleged domestic violence victim;

III.    Whether the State relied upon an irrelevant statute to procure domestic violence shelter records; and

IV.     Whether the exclusion of certain evidence denied Jaco a right to present his defense.

## Facts and Procedural History

M.P. and Jaco met during elementary school and dated as teenagers before going their separate ways.  M.P. married, had two children, and divorced; Jaco began a long-term relationship with V.K., with whom he ultimately had five children.[3]

Sometime after her divorce, M.P. saw Jaco in her father's neighborhood and initiated a conversation.  The two began to see each other socially, and M.P. soon moved into one of

---

[1] Ind. Code § 35-42-2-1.5.

[2] Ind. Code § 35-42-3-3(a)(1).

[3] The fifth child was born after the events giving rise to the instant charges.

2

Jaco's rental properties. The relationship was plagued with violence, as Jaco would frequently strike M.P. and spit in her face. She quickly decided to move in with her grandmother but continued to see Jaco. M.P. openly expressed a desire to marry Jaco and V.K. eventually became so upset that she moved from the residence she had shared with Jaco and the children.

On the evening of July 9, 2010, M.P. and Jaco had plans to go drinking. Jaco picked up M.P. from a hotel and drove to an Evansville bar, where they each became intoxicated. At some point during the evening, Jaco paused in his conversation with another patron and noticed that the keys to his truck were missing. M.P. had given the keys to an acquaintance and they had driven away. Jaco was able to obtain the acquaintance's cellphone number, and immediately called to demand that she drive the truck back. She complied, returning to the bar and exiting the truck.

Jaco yelled and screamed as he drove away, with M.P. still in the truck. Enraged, he grabbed M.P. by the back of her neck and slammed her head into the dashboard. Jaco repeatedly punched M.P. in the head and choked her; during this process, he lost control of the truck and it hit something. He pulled into a parking lot to assess the damage to the truck. By this time, M.P. was suffering extreme neck pain. She got out of the truck, laid down on the ground, and begged to be taken to the hospital. Instead, Jaco "yanked" M.P. off the ground and ordered her to get back into the truck. (Tr. 166.) He then continued to strike her and choke her with one hand as he drove.

Jaco arrived at the hotel where he had picked up M.P. Ignoring her pleas for medical

3

assistance, Jaco demanded that she "get her ass" into the hotel room so he could "f--- the s---" out of her. (Tr. 168.) M.P. proceeded into the room, where she frantically called 9-1-1 as Jaco stayed back momentarily to examine his truck. An ambulance arrived at the hotel parking lot; upon hearing it, M.P. ran out. However, Jaco caught up to her and carried her back into the room.

Undeterred, the emergency responders determined from which room the call had been placed. They knocked at the door and M.P. begged to be allowed to offer reassurances that she was alright. Jaco permitted M.P. to answer the door; when it was cracked open, she ran to the waiting ambulance. Jaco followed, and seated himself on the spine board. He would not move until police were summoned.

After M.P. was transported to a nearby hospital, it was discovered that two vertebrae of her neck were broken. Dr. Mark Cobb characterized the injury as a "hangman's fracture," an injury involving a high risk of death. (Tr. 106.) M.P. underwent surgery and was fitted with a halo device to stabilize the spine and neck. After several days in intensive care, M.P. went home with Jaco to the residence he had shared with V.K.[4] However, the violence did not end. According to M.P., "all the time she lived at Jaco's house, he was abusive." (Tr. 208.) He would grab M.P. and shove her. She required three pin replacements to the halo, something Dr. Cobb considered unprecedented. Jaco enlisted an employee, David Case ("Case"), and Jaco's teenaged daughters to watch M.P. and ensure she did not leave the residence.

---

[4] V.K. had very recently moved out. She and Jaco were, by agreement, sharing physical custody of their children.

4

On November 5, 2010, after she received a "whooping," M.P. made an attempt to leave. (Tr. 181.) She climbed over a balcony, ran down the street screaming, and flagged down a vehicle. The driver, John Daleiden ("Daleiden"), allowed M.P. to use his cell phone to call 9-1-1. M.P. asked the dispatcher to send police to help her leave the place she had been staying, and advised that more than one officer would be needed. Shortly, Jaco ran down the street and took M.P. back to his house.[5] Daleiden, who thought Jaco was offering assistance, advised the 9-1-1 dispatcher that M.P. had left the scene willingly.

After the November 5th attempted escape, Jaco nailed the door to the balcony shut and placed a dresser across it. However, on November 16, 2010, Jaco left to pick up one of his children from school, and M.P. was able to elude Case and run out the back door. She climbed over a privacy fence and ran into a nearby business. M.P. asked Brenda Walters ("Walters") to call a cab for her.

Walters observed that M.P. was crying and shaking and had two black eyes. After forming the opinion that M.P. was "terrified for her life," Walters advised calling 9-1-1 instead of a cab. (Tr. 345.) She placed M.P. in an inner office to keep her away from the main window. Meanwhile, Jaco drove up and down the street past the business numerous times.

Evansville Police Officer Cara Messmer ("Officer Messmer") responded to the dispatch. She transported M.P. to a hospital for evaluation, to a police station to give her statement, and to a domestic violence shelter. During transport, M.P. "cowered" in the

_____

[5] M.P. testified that Jaco then took her to a secluded location, held her captive in a van for about twelve hours, and raped her. However, the jury acquitted Jaco of rape.

backseat with her head covered, begging Officer Messmer not to drive by Jaco's residence. (Tr. 366.)

Based upon M.P.'s allegations that Jaco had broken her neck and kept her confined to his home against her will, on November 19, 2010, the State charged Jaco with Aggravated Battery and Criminal Confinement. He was subsequently charged with Rape.[6] On November 17, 2011, a jury found Jaco guilty of Aggravated Battery and Criminal Confinement and acquitted him of the rape charge. He received an aggregate sentence of fourteen years imprisonment.

On December 16, 2011, Jaco filed a motion to correct error, claiming he was entitled to a new trial because of the erroneous admission of a domestic violence shelter intake form relative to his long-term girlfriend, V.K. The motion to correct error was denied, and this appeal ensued.

## Discussion and Decision

### Standard of Review

The decision whether to grant or deny a motion to correct error rests within the sound discretion of the trial court. Hall v. State, 796 N.E.2d 388, 394 (Ind. Ct. App. 2003), trans. denied. The trial court abuses its discretion only if its decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. Boatner v. State, 934 N.E.2d 184, 186 (Ind. Ct. App. 2010).

### Mistrial

---

[6] Ind. Code § 35-42-4-1.

6

Jaco requested a mistrial after the State elicited the following testimony from Officer Messmer regarding her decision to call a detective to investigate M.P.'s complaints:

> Q:    Is it your normal course of business once you believe a crime has occurred to call a detective?
> A:    Not always.
> Q:    So why did you in this case?
> A:    The reason I did in this case is my honest reason is because I truly, I know she was telling the truth.

(Tr. 355.)  Jaco requested a hearing outside the presence of the jury.  He claimed that the State had interjected an evidentiary harpoon by deliberately eliciting vouching testimony in violation of a motion in limine, and insisted that he was therefore entitled to a mistrial.

The prosecutor stated that she had questioned Officer Messmer about the decision to call a detective anticipating that Officer Messmer would respond that it was customary for a patrol officer to call an officer "with more experience" in "more serious crimes."  (Tr. 358.)  Concluding that there had been no deliberate attempt to elicit vouching testimony, the trial court declined to grant a mistrial.  However, with Jaco's acquiescence, the trial court admonished the jury to disregard Officer Messmer's opinion testimony.  Jaco now claims this was inadequate to preserve his right to a fair trial.

A decision to grant or deny a motion for a mistrial lies within the discretion of the trial court.  Randolph v. State, 755 N.E.2d 572, 575 (Ind. 2001).  On appeal, the trial court's exercise of discretion is afforded great deference.  Mickens v. State, 742 N.E.2d 927, 929 (Ind. 2001).  This is so because the trial judge is in the best position to gauge the surrounding circumstances of an event and its impact upon the jury.  Id.

7

A mistrial is an extreme remedy that is only justified when other remedial measures are insufficient to rectify the situation. Id. To prevail on appeal from the denial of a motion for mistrial, the appellant must establish that the challenged conduct was so prejudicial and inflammatory that he was placed in a position of grave peril to which he should not have been subjected. Id. The gravity of the peril is determined by considering the misconduct's probable persuasive effect on the jury's decision, not the impropriety of the conduct. Id.

Here, Officer Messmer testified that she believed M.P.'s allegations. No expert or lay witness is competent to testify that another witness is or is not telling the truth. Ind. Evidence Rule 704(b); Angleton v. State, 686 N.E.2d 803, 812 (Ind. 1997), reh'g denied. The trial court recognized the impropriety of Officer Messmer's vouching testimony and instructed the jury to disregard it. A contemporaneous admonition is presumed to have cured any error. See Gamble v. State, 831 N.E.2d 178, 184 (Ind. Ct. App. 2005), trans. denied. We also observe that Jaco did not renew the request for a mistrial after the admonition. See Washington v. State, 902 N.E.2d 280, 289-90 (Ind. Ct. App. 2009) (observing that if an admonishment is insufficient to cure the error, the defendant must request a mistrial), trans. denied. Jaco failed to show that Officer Messmer's isolated reference[7] placed him in a position of grave peril to which he should not have been subjected. The denial of a mistrial did not constitute an abuse of discretion.

<u>Evidence of Prior Police Call</u>

---

[7] Jaco claims that, in closing argument, the prosecutor also "vouched for the victim" by stating M.P.'s testimony of being guarded is known to be true because of Walters' testimony. Appellant's Brief at 14. The statement, made without objection from Jaco, does not express the prosecutor's personal opinion of M.P.'s veracity. Rather, it is an invitation to the jury to draw a conclusion from the corroborative testimony presented.

During Officer Messmer's testimony, she described a prior dispatch to the Jaco residence:

> [V.K.] had called dispatch wanting transportation to a shelter and actually she had said that she needed assistance because she didn't have a car and she needed a ride and she wanted an officer to stand by so her husband couldn't harm her or her children.

(Tr. 370-71.) Jaco claims the foregoing was inadmissible under Indiana Rule of Evidence 404(b), which provides in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]

Jaco failed to object to Officer Messmer's testimony of a prior dispatch.

The defendant's failure to lodge a contemporaneous objection at the time evidence is introduced at trial results in waiver of the error on appeal. Brown v. State, 929 N.E.2d 204, 207 (Ind. 2010), reh'g denied. "The purpose of this rule is to allow the trial judge to consider the issue in light of any fresh developments and also to correct any errors." Id. A claim that has been thus waived can be reviewed on appeal if the reviewing court determines that a fundamental error occurred. Id. The fundamental error exception is "'extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process.'" Id. (quoting Mathews v. State, 849 N.E.2d 578, 587 (Ind. 2006)). The exception is available only in "'egregious circumstances.'" Id. (quoting Brown v. State, 799 N.E.2d 1064, 1068 (Ind. 2003)).

9

The rationale for the prohibition against bad act and character evidence is that the jury is precluded from making the forbidden inference that the defendant had a criminal propensity and therefore engaged in the charged conduct. Monegan v. State, 721 N.E.2d 243, 248 (Ind. 1999). We observe that the testimony Jaco now challenges concerns a request for transportation assistance (which V.K. later testified was unfounded) as opposed to an extrinsic act. Officer Messmer described no particular crime, wrong, or act on Jaco's part.[8] Nor is a request for transportation direct evidence of Jaco's character. At most, the testimony suggested that Jaco's other domestic partner may have been fearful of him.

Nonetheless, such testimony lacked relevance to an issue in the case. See Evidence Rule 401 (relevant evidence is that evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.") Only relevant evidence is admissible at trial. Evidence Rule 402. Accordingly, we agree with Jaco that the particular testimony was admitted in error. Moreover, it was admitted in the State's case-in-chief and not as rebuttal evidence, as the State now suggests.[9]

Nonetheless, "[t]he improper admission is harmless error if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court there is no substantial likelihood the challenged evidence contributed to the conviction." Turner v.

---

[8] Shelter employee Jennifer Ballard testified that a physical assault was not a prerequisite to being allowed to stay in the particular shelter to which V.K. was transported.

[9] V.K. subsequently testified that Jaco (with whom she reconciled after M.P. left) was not abusive, she did not fear him, she was tired of drama brought on by M.P. and had used Jaco as an excuse to get police assistance to relocate from Jaco's residence. In rebuttal, the State produced a shelter intake form for V.K.

State, 953 N.E.2d 1039, 1059 (Ind. 2011). "Generally, errors in the admission of evidence are to be disregarded unless they affect the substantial rights of a party." Id. Here, the State presented substantial independent evidence of Jaco's guilt.

One who knowingly or intentionally inflicts upon a person an injury that creates a substantial risk of death commits aggravated battery. Ind. Code § 35-42-2-1.5. One who knowingly or intentionally confines another person without the other person's consent commits criminal confinement. Ind. Code § 35-42-3-3(a)(1). The offense is a Class C felony if it results in bodily injury to a person other than the confining person. Ind. Code § 35-42-3-3(b)(1)(C).

M.P. testified that Jaco repeatedly slammed her head against his truck dashboard, immediately causing her great pain. Emergency responders testified that Jaco interfered with their attempts to render medical assistance. When M.P. was finally medically evaluated, she was determined to have a life-threatening condition referred to as hangman's fracture – multiple vertebrae in her neck were broken.

M.P. also testified that Jaco had thereafter confined her against her will. Her testimony was corroborated in part by two individuals who saw M.P. run down the street on November 5, 2010, only to be overtaken by Jaco and taken back to his house. Additionally, Walters testified that, based upon her observations in the neighborhood, Case appeared to have functioned as a "guard dog" stationed outside in Jaco's yard, "rain or snow." (Tr. 333.) She also observed Jaco driving back and forth repeatedly after M.P. had arrived at Walters' business on November 16th. Walters described M.P. as "a woman terrified for her life." (Tr.

11

345.) Officers who searched Jaco's residence found that a door exiting to the balcony had been nailed shut, as M.P. described, and impressions on the carpet indicated that heavy furniture had recently blocked the door.

In light of the substantial independent evidence of Jaco's guilt, the admission of testimony that V.K. sought transportation to a shelter was merely harmless error. It is not so egregious as to rise to the level of fundamental error.

Shelter Intake Form

Jaco called V.K. as a defense witness. She testified that she had no fear of Jaco, but had actually been afraid of M.P. She explained that her visit to a shelter occurred after she was tired of "drama" and "tired of dealing with" M.P. (Tr. 524.) According to V.K., she used Jaco as an "excuse" because the police dispatcher had indicated that a threat must be present to warrant transportation to a shelter. (Tr. 526.)

In rebuttal, the State offered as an evidentiary exhibit the shelter's "crisis intake form" prepared by the shelter employee who interviewed V.K. (Tr. 868.) The form included the handwritten notation:

> He has been physical in the past. He is always threatening to hurt her if she leaves & takes the kids w/her. He also threatens to kill himself if she leaves. She just got the nerve to leave this afternoon while he was gone. [V.K.] requests shelter for her safety & that of her children.

(App. 161.)

Jaco argues that he is entitled to reversal of his convictions because the trial court erred in issuing a subpoena pursuant to Indiana Code § 33-39-1-4. In part, the statute provides:

12

When a prosecuting attorney receives information of the commission of a felony or misdemeanor, the prosecuting attorney shall cause process to issue from a court … having jurisdiction to issue the process to the proper officer, directing the officer to subpoena the persons named in the process who are likely to have information concerning the commission of the felony or misdemeanor.

According to Jaco, this statute was an improper vehicle for procurement of the shelter document during the trial, as the statute is intended to assist a prosecuting attorney in the gathering of information only before a charging information is filed.

At trial, Jaco made no such objection. Indeed, when the State requested the issuance of the subpoena and Jaco's counsel was invited to comment, he responded "It's exparta [sic] Your Honor, I've got nothing to say about it, it's not my business." (Tr. 670.) Jaco clearly acquiesced to the statutory discovery, even if belated. Invited error does not warrant reversal on appeal. Kingery v. State, 659 N.E.2d 490, 494 (Ind. 1995), reh'g denied.

## Exclusion of Evidence

Jaco claims he was denied the right to present a defense when the trial court excluded testimony that M.P.'s mother had married a man M.P. once dated and that Case had refused an offer of leniency contingent upon his providing evidence against Jaco.[10]

A trial court exercises broad discretion in ruling on the admissibility of evidence, and an appellate court should disturb its ruling only where it is shown that the court abused its discretion. Camm v. State, 908 N.E.2d 215, 225 (Ind. 2009). Generally, the admission or exclusion of evidence will not result in a reversal on appeal absent a manifest abuse of discretion that results in the denial of a fair trial. Dorsey v. State, 802 N.E.2d 991, 993 (Ind.

---

[10] By the time of Jaco's trial, Case had also been charged with Confinement.

13

Ct. App. 2004).

"The right to present a defense is a fundamental element of due process of law" and a defendant has a right to present relevant evidence offered to challenge the charges against him. Manigault v. State, 881 N.E.2d 679, 690 (Ind. Ct. App. 2008). As a corollary, a defendant does not have the right to present irrelevant evidence. We fail to see how informing the jury that M.P.'s mother had married M.P.'s former boyfriend would challenge any of the charges against Jaco.

Case testified for the defense but was not permitted to discuss an ostensible offer from Detective Brent Melton. In an offer to prove, Case testified that Detective Melton told him "if you tell us what we want to hear your record will be clean, you'll be wiped clean, a free man, you are free to go" and Case responded, "there is nothing to tell, nothing has happened." (Tr. 505.) According to Case, that was the end of the conversation.

The jury is entitled to know if a witness has received a benefit or promise of leniency in exchange for his testimony. Rubalcada v. State, 731 N.E.2d 1015, 1024 (Ind. 2000). However, mere preliminary discussions are not subject to mandatory disclosure. Id. Detective Melton denied that an overture of this sort was even made. Nonetheless, it is clear that Case received no actual promise of leniency. Even assuming an offer not to pursue charges against Case was in fact made, Case did not accept the offer and so no bargain was reached.

The proffered evidence was in essence an attempt to bolster Case's credibility. Indeed, in arguing for its admission, Jaco's counsel explained that "[Case's] credibility is

14

thereby enhanced." (Tr. 506.) On appeal, Jaco argues that a jury would find Case more believable because he refused to turn on his friend. Nonetheless, Jaco does not offer authority supporting his entitlement to elicit bolstering testimony. Jaco has shown no manifest abuse of the trial court's discretion.

## Conclusion

Jaco has not demonstrated his entitlement to a mistrial. Nor has he demonstrated fundamental error or reversible error in the trial court's evidentiary rulings.

Affirmed.

VAIDIK, J., and BROWN, J., concur.